# COURT OF APPEALS OF VIRGINIA

**Record No. 0882-25-3**

REBECCA SUE ORANGE
v.
COMMONWEALTH OF VIRGINIA

Present: Judges Causey, Raphael and Duffan

Argued at Lexington, Virginia

Opinion Issued July 28, 2026

## FROM THE CIRCUIT COURT OF BEDFORD COUNTY
James W. Updike, Jr., Judge

Eric Weathers, Assistant Public Defender (Virginia Indigent Defense Commission, on briefs), for appellant.

Dennis J. McLoughlin, Jr., Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General; Rachel A. Glines, Assistant Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## <u>JUDGE STUART A. RAPHAEL</u>

The question presented here is whether the Second Amendment bars the States from prohibiting persons convicted of forgery from possessing a firearm once they have served their sentence. The appellant argues that people convicted of nonviolent felonies like forgery do not permanently forfeit their Second Amendment rights, including the right to possess a firearm in the home for self-defense. The Commonwealth counters that the Second Amendment permits disarming anyone convicted of a felony, even a nonviolent one. Both sides recognize that the federal circuits are split on this question.

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

Resolving this appeal on the best and narrowest grounds, we hold that the Second Amendment does not prohibit the States from disarming persons convicted of forgery. Forgery was punishable in most American jurisdictions by death and forfeiture of all property when the Second Amendment was ratified in 1791. Not only was disarmament a lesser-included punishment when the Second Amendment was ratified, but taking away the offender's firearm rights is consistent with our Nation's tradition of disarming those persons who so severely violate established legal norms as to be deemed untrustworthy to possess firearms. We leave for another day whether States may disarm persons convicted of other nonviolent felonies.

BACKGROUND

The facts are undisputed. In 2021, appellant Rebecca Sue Orange was convicted of forgery, a Class 5 felony, in violation of Code § 18.2-172. The record is silent on the details of her offense or the punishment imposed, except that she was not on probation at the time of the offense.

In May 2024, a sheriff's deputy responded to a domestic-disturbance call at Orange's home. Orange was intoxicated and had gotten into an argument with her fiancée. When the deputy arrived, Orange was sitting in a chair on the front deck; a 12-gauge shotgun was leaning against the wall behind her. Orange's fiancée showed the deputy a video of Orange carrying the shotgun into the house.

In November 2024, Orange was indicted under Code § 18.2-308.2(A) on one count of possessing a firearm after having been convicted of a nonviolent felony. Orange moved to dismiss the indictment, arguing that the felon-in-possession statute as applied to her violated the Second Amendment and similar protections in Virginia's constitution. The Commonwealth responded that the Second Amendment protected only law-abiding citizens and that the United

States has a long history of disarming even nonviolent offenders who ignore the law or pose a threat to the established legal order.

The court denied the motion to dismiss. Orange conditionally pleaded guilty to an amended indictment for possession of a firearm by a nonviolent felon "outside of ten years" in violation of the same statute, reserving her right to appeal the denial of her motion to dismiss.[2] The court sentenced Orange to incarceration for a term of "5 years in the penitentiary suspended after serving 1 year in the penitentiary." The suspended sentence was conditioned on five years of good behavior and two years of supervised probation. The court stayed execution of the sentence pending appeal.

ANALYSIS

Orange renews her Second Amendment argument that Code § 18.2-308.2 is unconstitutional as applied to persons previously convicted of *nonviolent* felonies.[3] Orange Br. 1. She concedes that "[t]he historical tradition supports disarming those who have been convicted of a violent felony." *Id.* at 14-15. But she argues that this tradition does not support "disarming . . . those convicted of *nonviolent* felonies." *Id.* at 15. For its part, the Commonwealth responds broadly that "[l]aws prohibiting the possession of a firearm by a non-violent felon are constitutional." Commonwealth Br. 6.

Because the caselaw in this area is still percolating, we decline to resolve the broader question of whether the Second Amendment bars States from disarming *all* persons previously

---

[2] The "outside of ten years" qualifier avoided the mandatory-minimum sentence of two years in prison. *See* Code § 18.2-308.2(A) ("Any person who violates this section by knowingly and intentionally possessing or transporting any firearm and who was previously convicted of any other felony within the prior 10 years shall be sentenced to a mandatory minimum term of imprisonment of two years.").

[3] Orange does not renew her argument that the Virginia Constitution also protects the right of nonviolent felons to possess a firearm. So we do not consider that claim. *See* Rule 5A:20(c)(1) ("Only assignments of error listed in the brief will be noticed by this Court.").

convicted of nonviolent felonies. We agree with the Commonwealth, however, that the Second Amendment permits disarming convicted forgers because forgery was punishable by death and forfeiture of all property when the Second Amendment was ratified.

A. Bruen *and* Rahimi *compel a two-step historical inquiry into whether a law challenged under the Second Amendment is "relevantly similar" to laws that our tradition is understood to permit.*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In 2008, the United States Supreme Court held that the Second Amendment confers "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 622 (2008). In a majority opinion authored by Justice Scalia, the Court invalidated the District of Columbia's "ban on handgun possession in the home," as well as "its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635.

*Heller* "declin[ed] to establish a level of scrutiny for evaluating Second Amendment restrictions." *Id.* at 634. The Court said instead that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' would fail constitutional muster." *Id.* at 628-29 (citation and footnote omitted).

Still, *Heller* cautioned that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. So "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. The Court said that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before

us." *Id.* at 635. In the meantime, the Court identified these examples as "presumptively lawful regulatory measures," noting that the "list does not purport to be exhaustive." *Id.* at 627 n.26.

Two years later, the Court held "that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). In a majority opinion written by Justice Alito, the Court held that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. As in *Heller*, the Court did not identify the legal test by which lower courts should determine whether a firearm restriction passes constitutional muster. Seven justices agreed that nothing in the Court's opinions cast doubt on longstanding regulatory measures such as prohibitions on felons possessing firearms. *See id.* at 786 (plurality opinion by Alito, J., joined by Roberts, C.J., and Scalia and Kennedy, J.J.); *id.* at 925 (Breyer, J., dissenting, joined by Ginsburg and Sotomayor, J.J.).

In 2022, the Supreme Court ruled that courts should not evaluate Second Amendment challenges to firearm laws using the traditional "'two-step' framework . . . that combines history with means-end scrutiny." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). In an opinion for the Court by Justice Thomas, *Bruen* said that "the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Instead of the traditional "two-step approach," which the Court found "one step too many," the "government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

The analysis required by *Bruen* also "involves two steps." *Wolford v. Lopez*, 225 L. Ed. 2d 494, 506 (2026). First, a court must determine whether the challenged law "clashes with the 'plain text' of the Amendment's language." *Id.* (quoting *Bruen*, 597 U.S. at 24).

> This inquiry entails three subsidiary questions. First, does the law apply to "the people"—which is to say, to "all members of the political community"? Second, does it concern any form of "Arms," *i.e.*, any weapon customarily used for offensive or defensive purposes? Third, does the law place any restrictions on either the "keep[ing]" (*i.e.,* possession) or the "bear[ing]" (*i.e.*, carrying) of arms?

*Id.* (alterations in original) (citations omitted). If the plain text of the Second Amendment does not cover the individual's conduct, "that ends the inquiry: the Second Amendment does not apply." *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1891 (2025). But if the "challenged law falls within the plain text, it is presumptively unconstitutional—which means that it *may* violate the preexisting right that the Amendment codified," then the analysis proceeds to the second step. *Wolford*, 225 L. Ed. 2d at 506.

At the second step, "the relevant government—federal, state, or local—may be able to show that its challenged law did not infringe the historical understanding of the codified right." *Id.* "A variety of sources, including scholarship, may aid this inquiry. But often, the best evidence may be what *Bruen* called historical analogues. These are old legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right." *Id.* (citation omitted).

> *Bruen* identified three important inquiries that courts should undertake in evaluating proffered analogues. The first is the number of jurisdictions in which they were adopted. The second is the extent to which they were well-accepted.
>
> . . . .
>
> The third is whether any analogue or collection of analogues is "relevantly similar" to the modern law. Determining whether this condition is met requires consideration of "how" the analogue

- 6 -

> restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. And a court must also consider "why" the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law.

*Id.* at 506-07 (citations omitted).

Applying that approach to the historical evidence in *Bruen*, the Court invalidated a New York law that permitted the issuance of a license to carry a firearm in public only when the applicant demonstrated a special need for self-defense. 597 U.S. at 11, 34-71. Although Justice Thomas's majority opinion did not mention it, five justices wrote separately to repeat *Heller*'s assurance that the Court was not casting doubt on longstanding prohibitions on the possession of firearms by felons. *Id.* at 80-81 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *id.* at 129 (Breyer, J., concurring, joined by Sotomayor and Kagan, J.J.).

In 2024, the Court in *United States v. Rahimi*, 602 U.S. 680 (2024), refined the required historical inquiry in an opinion by Chief Justice Roberts. The Court repeated that a reviewing "court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 692 (alteration in original) (quoting *Bruen*, 597 U.S. at 29 & n.7). "Why and how the regulation burdens the right are central to this inquiry." *Id.* "And when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.' The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). The Court reiterated that "*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion [in *Heller*] stated that many such prohibitions, like those on the

possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 699 (quoting *Heller*, 554 U.S. at 626, 627 n.26); *id.* at 735 (Kavanaugh, J., concurring) (same).

*Rahimi* upheld the constitutionality of the federal statute that "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." *Id.* at 684-85 (quoting 18 U.S.C. § 922(g)(8)). The Court reasoned that, "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms. As applied to the facts of this case, Section 922(g)(8) fits comfortably within this tradition." *Id.* at 690. The Court relied on a variety of historical analogues to support that conclusion. The analogues included "going armed" laws that prohibited riding with weapons to frighten people, *id.* at 693-94, 697-99; and "surety" laws that "authorized magistrates to require individuals suspected of future misbehavior to post a bond," *id.* at 695-66, 699.

The Court recently applied the *Bruen-Rahimi* framework again in *United States v. Hemani*, 225 L. Ed. 2d 314 (2026), as well as in *Wolford*. *Hemani* held that the prosecution there under 18 U.S.C. § 922(g)(3) was inconsistent with the Second Amendment. Section 922(g)(3) prohibits firearm possession by anyone "who is an unlawful user of or addicted to any controlled substance." Hemani's conviction under that statute was premised on "a gun he kept in the house," "some marijuana on the property," and his admission "that he used marijuana 'about every other day.'" *Hemani*, 225 L. Ed. 2d at 322. In an opinion by Justice Gorsuch, joined by six other Justices, the Court rejected the government's position that it could "automatically strip Mr. Hemani of his Second Amendment right to possess a firearm because he uses marijuana a few times a week," regardless of "how much marijuana [he] uses or what effect it has on him." *Id.* at 331-32. The Court disagreed with the government that its expansive position was

supported by the history of vagrancy, civil-commitment, and surety laws. *Id.* at 325-29. The "historical evidence the government present[ed]" simply "d[id] not support the categorical restriction it urge[d]." *Id.* at 330 n.6.[4]

*Hemani* cautioned that the decision in "many respects" was "a narrow one." *Id.* at 331. The Court did "not address efforts to ban addicts, or those presently intoxicated, from possessing a firearm," nor did it "address other prophylactic laws Congress might adopt after determining that users of a particular drug pose a special risk of misusing firearms." *Id.* The Court also did "not address 18 U.S.C. § 922(g)(1)'s provision disarming individuals convicted of felonies (often including drug-related ones)." *Id.* Indeed, the Court observed that unlike convictions under § 922(g)(3), convictions under "other provisions," such as the felon-in-possession ban in § 922(g)(1), "involve some manner of pre-deprivation process before an individual's Second Amendment rights are lost." *Id.* at 330 n.6. "For that reason, they differ from subsection (g)(3) and 'nothing in our opinion should be taken to cast doubt' on them." *Id.* (quoting *Heller*, 554 U.S. at 626). The Court added that nothing in the opinion should be construed "to suggest 'that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse.'" *Id.* (quoting *Rahimi*, 602 U.S. at 698).

---

[4] One of our decisions last year held that the Second Amendment permitted disarming a person who admitted to being a user of controlled substances while simultaneously possessing a firearm. *Watkins v. Commonwealth*, 83 Va. App. 456, 463 (2025), *petition for appeal refused*, No. 250325 (Va. Sept. 11, 2025). A panel of this Court subsequently concluded that "the right to keep and bear arms in the home for self-defense does not include the right to concurrent drug and firearm possession, even where the arms in question are found in the home not on the defendant's person." *Fitzgerald v. Commonwealth*, No. 0261-24-3, slip op. at 19, 2025 Va. App. LEXIS 319, at *27 (June 3, 2025) (unpublished), *petition for appeal granted*, No. 250588, 2025 Va. LEXIS 65 (Nov. 7, 2025). The assignments of error allowed by our Supreme Court in *Fitzgerald* include that "[t]he Court of Appeals erred in finding that Mr. Fitzgerald, by his use of drugs and conduct, fell under the ratio decidendi of *Watkins*" and that "*Watkins* was wrongly decided and should be overturned, reversed, or modified." 2025 Va. LEXIS 65, at *1 (citation omitted).

The Court issued its opinion in *Wolford* a week later. In an opinion by Justice Alito, joined by five other Justices, the Court invalidated a Hawaii law that prohibited a person with a conceal-carry permit from bringing firearms onto private property open to the public without the express and affirmative consent of the property owner. 225 L. Ed. 2d at 503. The law effectively prohibited persons lawfully carrying firearms "from entering many places that people routinely visit in the course of their daily routines, such as gas stations, convenience stores, restaurants, coffee shops, drug stores, grocery stores, 'big box' stores, home improvement stores, barber shops or hair salons, dry cleaners, and laundromats." *Id.*

We now apply the *Bruen-Rahimi* framework here.

B. *The Commonwealth does not dispute at Step 1 that the Second Amendment covers Orange's conduct in possessing a firearm at home.*

At Step 1 of the analysis required by *Rahimi* and *Bruen*, the Commonwealth does not contest Orange's assertion that the plain text of the Second Amendment covers her conduct in possessing a shotgun at home. As *Heller* stated, "the home" is "where the need for defense of self, family, and property is most acute." 554 U.S. at 628. Nor does the Commonwealth dispute that ordinary shotguns—as opposed to "short-barreled shotguns"—qualify as the sort of weapon "'in common use'" when the Second Amendment was ratified. *Id.* at 625, 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). So we start from the premise that the Second Amendment covers Orange's conduct in possessing a firearm in the home.[5]

_____

[5] The Commonwealth also does not claim—as it did in the trial court below and in *Ginevan*—that a convicted felon "is not a law-abiding citizen" and therefore "not one of 'the people'" covered by the Second Amendment. Brief of the Commonwealth at 9-10, *Ginevan v. Commonwealth*, 83 Va. App. 1 (2024) (No. 1765-23-4). We noted in *Ginevan* that federal circuits are split on that question. 83 Va. App. at 19 & n.13 (collecting cases). So we assumed without deciding that Ginevan was one of "the people" protected by the Second Amendment. *Id.* at 20. *But see Hemani*, 225 L. Ed. 2d at 322 ("The Second Amendment protects the right of 'all Americans' to keep and bear firearms for self-defense." (quoting *Heller*, 554 U.S. at 581)).

*C. The Commonwealth has satisfied its Step 2 burden to show that disarming felony forgers is consistent with our historical tradition.*

We now turn to "whether the challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition." *Rahimi*, 602 U.S. at 681 (citing *Bruen*, 597 U.S. at 26-31).

*1. We do not reach the Commonwealth's argument that the Second Amendment permits all nonviolent felons to be disarmed.*

As already noted, *Rahimi* reiterated *Heller*'s pronouncement that "many" prohibitions on firearm possession, "like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 699 (quoting *Heller*, 554 U.S. at 626-27 & n.26). Chief Justice Roberts was joined in that statement by seven other justices. *Id.* at 683; *see also id.* at 735 (Kavanaugh, J., concurring) (same). The seven-Justice majority in *Hemani* repeated that nothing in that decision "should be taken to cast doubt" upon the felon-in-possession prohibition in 18 U.S.C. § 922(g)(1). 225 L. Ed. 2d at 330 n.6 (quoting *Heller*, 554 U.S. 626). *Wolford* provided the same assurance. 225 L. Ed. 2d at 504.[6]

Buoyed by that line of authority, the Commonwealth argues that *any* felony conviction—even for a nonviolent crime—conclusively satisfies the Commonwealth's burden under *Bruen* and *Rahimi* to show that felon-disarmament is "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29 & n.7). The Commonwealth points out that "death was 'the standard penalty for all serious crimes' at the Founding." Commonwealth Br. 11 (quoting *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019)). And "at common law, 'virtually all felonies were punishable by death.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 13 (1985)).

---

[6] In *Rahimi*, Justice Thomas called that statement "dicta." 602 U.S. at 773 (Thomas, J., dissenting). But he joined the majority opinions containing that same statement in both *Hemani* and *Wolford*.

But the federal circuits are split on whether the Second Amendment permits a State to disarm a person convicted of only a nonviolent felony. Seven circuits have held that the Second Amendment permits disarming a person who was convicted of a felony without regard to whether the crime was violent or nonviolent.[7] Most of those have rejected the need to examine on a "felony-by-felony" basis whether disarmament is allowed.[8] Two circuits, on the other hand, have held that disarmament is unconstitutional for persons convicted of at least some nonviolent crimes that do not suggest a risk of future dangerousness.[9] For its part, the Sixth Circuit has ruled that defendants previously convicted of even violent crimes are entitled, when prosecuted for possessing a firearm, to show that they should not have lost their firearm rights. *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024). The Seventh Circuit has "not decide[d] whether an individual with a non-dangerous felony [conviction] can be disarmed." *United States v. Watson*, 171 F.4th 1012, 1013 (7th Cir. 2026).[10]

---

[7] *See Zherka v. Bondi*, 140 F.4th 68, 93 (2d Cir. 2025), *cert. denied*, 223 L. Ed. 2d 555 (2026); *United States v. Hunt*, 123 F.4th 697, 705-07 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 2756 (2025); *United States v. Jackson*, 110 F.4th 1120, 1127-29 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 2708 (2025); *United States v. Duarte*, 137 F.4th 743, 748 (9th Cir. 2025) (en banc), *cert. denied*, 223 L. Ed. 2d 556 (2026); *Vincent v. Bondi*, 127 F.4th 1263, 1265 (10th Cir. 2025), *cert. denied*, 146 S. Ct. 1768 (2026); *United States v. Dubois*, 139 F.4th 887, 893 (11th Cir. 2025), *cert. denied*, 223 L. Ed. 2d 570 (2026); *United States v. Johnson*, 158 F.4th 200, 208-09 (D.C. Cir. 2025); *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019).

[8] *See, e.g.*, *Hunt*, 123 F.4th at 708; *Jackson*, 110 F.4th at 1125; *Duarte*, 137 F.4th at 761; *Vincent*, 127 F.4th at 1265.

[9] *See Range v. Att'y Gen. U.S.*, 124 F.4th 218, 231 (3d Cir. 2024) (en banc) ("Range's crime—making a false statement on an application for food stamps—did not involve a firearm, so there was no criminal instrument to forfeit"); *United States v. Cockerham*, 162 F.4th 500, 504 (5th Cir. 2025) (holding that conviction for failing to pay child support—an offense punishable under State law by up to five years in prison—could not justify loss of Second Amendment rights), *cert. denied*, 2026 U.S. LEXIS 2455 (June 8, 2026) (No. 25-1029).

[10] Although the First Circuit has not yet answered that question either, it recently rejected a challenge to 18 U.S.C. § 922(g)(5)(A), which makes it a crime for "alien[s]" who are "illegally or unlawfully in the United States" to possess a firearm tied to interstate commerce. *See United States v. Vizcaíno-Peguero*, 175 F.4th 34 (1st Cir. 2026). The court concluded in that context

- 12 -

Our own cases have declined to give a blanket answer to whether the Second Amendment categorically permits disarming persons convicted of a felony. True, we held before *Bruen* was decided that the felon-in-possession ban in Code § 18.2-308.2(A) could be applied to a person "previously adjudicated delinquent for an offense that would have been a felony if he had been an adult." *Prekker v. Commonwealth*, 66 Va. App. 103, 104-05 (2016), *overruled on other grounds by Jennings v. Commonwealth*, 82 Va. App. 692, 695 (2024) (en banc). The Commonwealth insists that *Prekker* binds us to the categorical rule that a previous felony conviction justifies permanent disarmament. Commonwealth Br. 7-9. But we do not share the Commonwealth's assuredness. We overruled *Prekker*'s application of a mandatory-minimum sentence for firearm possession to a person previously adjudicated a juvenile delinquent. *Jennings*, 82 Va. App. at 695.

Moreover, *Prekker* turned on the defendant's concession "that Code § 18.2-308.2(A)(i)'s permanent ban on felons possessing firearms is valid" under *Heller*. *See Prekker*, 66 Va. App. at 118. That begs the question whether the result would be the same, without such a concession, under *Bruen* and *Rahimi*. *See, e.g., Commonwealth v. Holman*, 303 Va. 62, 75 (2024) ("[A] concession of law is not binding on a court."). We also declined the categorical approach urged by the Commonwealth in *Ginevan v. Commonwealth*, 83 Va. App. 1 (2024), *petition for appeal granted*, No. 250051, 2025 Va. LEXIS 35 (June 30, 2025), saying it was "a debate into which we need not wade." *Id.* at 19.[11]

When possible, we seek to resolve cases on the best and narrowest ground. *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023). We therefore decline the Commonwealth's invitation to

---

that the Second Amendment did not require an individualized finding of dangerousness to warrant disarmament. *Id.* at 47.

[11] *Ginevan* upheld the constitutionality of Code § 18.2-308.2(A) as applied to firearm possession by "violent" felons. 83 Va. App. at 3, 28.

follow the lead of most federal circuits that have categorically upheld felon-in-possession laws regardless of whether the underlying crime was violent or nonviolent.

As explained below, the founders understood that forgery was punishable by death and forfeiture of all property, and that offenders who so transgressed such established legal norms could be disarmed. Because that is an adequate basis on which to affirm Orange's conviction, we leave for another day whether the Second Amendment permits disarming persons who commit *other* nonviolent felonies.

> 2. *The founders recognized forgery as a felony punishable by death and forfeiture of all property.*

Is a law that disarms felony forgers "consistent with the Nation's historical tradition of firearm regulation"? *Bruen*, 597 U.S. at 24. After surveying historical laws against forgery in England and the United States before and after the Second Amendment was ratified in 1791, we answer in the affirmative.[12]

---

[12] The dissent critiques our historical survey for including laws that were not cited by the Commonwealth, even as the dissent cites numerous other laws not mentioned by the parties. *Watkins*, however, squarely rejected the argument that "in imposing the burden to provide historical analogues for a contested statute on 'the Government,' the Supreme Court of the United States intended to confine appellate courts to consider only the historical analogues provided at the trial level by line prosecutors." 83 Va. App. at 475 n.18. The Court in *Hemani* said, "We decide cases 'based on the historical record' and arguments 'compiled by the parties' before us." 225 L. Ed. 2d at 324-25. But that dictum does not disable courts from evaluating other historical laws not cited by the parties that bear on each side's principal claim that a modern law is (or is not) consistent with the historical tradition underlying the Second Amendment.

The Commonwealth's principal claim here is that "death was 'the standard penalty for all serious crimes' at the Founding." Commonwealth Br. 11 (quoting *Bucklew*, 587 U.S. at 129). It does not transgress *Bruen* or *Hemani* to look more deeply at Founding Era laws not cited by the Commonwealth to test its claim in the context of the forgery statute at issue. To the contrary, it is the "*court* [that] must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit . . . . Discerning and developing the law in this way is 'a commonplace task *for any lawyer or judge*.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 28) (emphases added). Indeed, courts are uniquely qualified to take judicial notice of current and historic laws in any American jurisdiction, whether cited by the parties or not. *See* Va. R. Evid. 2:202(a) ("Whenever . . . it becomes necessary to ascertain what the law, statutory, administrative, or otherwise, of this Commonwealth, of another state, [or] of the United States

The most serious forms of forgery in Virginia are currently classified as Class 4 felonies, Code §§ 18.2-168 to -171, punishable by "a term of imprisonment of not less than two years nor more than 10 years and . . . a fine of not more than $100,000," Code § 18.2-10(d). The most serious forms of forgery under federal law are punishable by a prison term of up to 25 years. *See, e.g.*, 18 U.S.C. § 1546 (forgery of immigration documents to facilitate international terrorism). But it was not always so.

When the Bill of Rights was ratified in 1791, England, the United States, Virginia, and most of our sister States permitted forgery to be punished by death and forfeiture of all personal and real property. Although Virginia repealed the death penalty for forgery in 1796, it was not until 1825—34 years after the Second Amendment was ratified—that the federal government followed suit.

*England before and after American independence*

William Blackstone's 18th century treatise on English law "constituted the preeminent authority on English law for the founding generation." *Heller*, 554 U.S. at 593-94 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)). His treatise was "'heavily' relied upon by the Founders." *Howell v. McAuliffe*, 292 Va. 320, 347 n.15 (2016) (quoting Akhil Reed Amar, *America's Unwritten Constitution: The Precedents and Principles We Live By* 7 (2012)).

The term *felony* in Blackstone's time meant "a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *The Commentaries on the Laws of England* 95 (1769). "If a statute makes any new offence felony, the law implies that it shall be

---

. . . is, *or was, at any time*, the court may take judicial notice thereof *whether specially pleaded or not*." (emphases added)). Doing so does not run afoul of the party-presentation principle when the historic laws, as here, are considered in support or in opposition to the party's principal argument.

- 15 -

punished with death, . . . as well as with forfeiture: unless the offender prays the benefit of clergy; which all felons are entitled once to have unless the same is expressly taken away by statute." *Id.* at 98.

The "benefit of clergy" was the "one palliative element which in many cases mitigated" the death penalty for felony conviction. George W. Dalzell, *Benefit of Clergy in America & Related Matters* 10 (1955).

> By the seventeenth century, most persons convicted of a crime within the benefit of clergy could successfully claim the benefit if [1] they had never claimed the benefit before, and [2] they could "read as clerks." Upon a guilty verdict, the sentencing judge would ask the defendant if he had anything further to say as to why judgment and execution should not proceed. If the defendant then "prayed the book" he would be given the chance to read a passage from the Bible. If the defendant passed this test, the judge was then obliged to arrest judgment; the convict was then "burnt in the hand," and in most cases probably released.

Jeffrey K. Sawyer, *Benefit of Clergy in Maryland and Virginia*, 34 Am. J. Legal Hist. 49, 53-54 (1990); *see also* Kathryn Preyer, *Penal Measures in the American Colonies: An Overview*, 26 Am. J. Legal Hist. 326, 331 n.9 (1982).

All felony offenses at common law were "clergyable" unless the statute provided otherwise. *Sawyer*, *supra*, at 53. The most serious offenses, such as "[m]urder, house-breaking, certain kinds of robbery, horse-stealing, [and] certain kinds of arson . . . were explicitly withdrawn from the list of clergyable offenses by statute. The most important felonies that remained clergyable were petty larceny and manslaughter . . . ." *Id.*

England had long treated forgery as a heinous crime. The Statute Against Forgers of False Deeds and Writings of 1562, 5 Eliz. ch. 14, punished a convicted forger by making him "stand[] in the pillory, . . . having both his ears cut off . . . and his nostrils slit, and seared; by forfeiture to the crown of the profits of his lands, and by perpetual imprisonment." Blackstone,

*supra*, at 245-46.  A second offense was a "felony without benefit of clergy."  *Id.* at 246.  The punishment was severe despite that forgery was "attended with no act of violence."  *Id.* at 229.

Blackstone catalogued various acts of Parliament in subsequent years that imposed the death penalty for forgery.  *Id.* at 246-47.  Parliament continued to enact new laws that made forgery punishable by death "without benefit of clergy," including the dreaded Stamp Act of 1765, 5 Geo. 3 c.12, §§ 18-19 (Eng.).

It was not until 66 years after American independence that England eliminated the death penalty for most forgery crimes, though not for forgery of wills and other testamentary instruments.  *See* An Act for Abolishing the Punishment of Death in certain Cases of Forgery of 1832, 2 & 3 Will. 4 ch. 123 (Eng.).  England eliminated the death penalty for the remaining forgery crimes in 1837.  *See* An Act to Abolish the Punishment of Death in Cases of Forgery of 1837, 7 Will. 4 & 1 Vict. ch. 84 (Eng.).

*Virginia and other States*

Numerous American jurisdictions before and after independence punished the crime of forgery just as severely as England.  "Between 1790 to 1829 . . . the states carried out an estimated 779 executions, and did so for crimes against people (e.g., murder and rape) [and] property (e.g., arson, forgery, and horse stealing)."  *Watson*, 171 F.4th at 1023 (alterations in original) (quoting Hannah Freedman, *The Modern Federal Death Penalty: A Cruel and Unusual Punishment*, 107 Cornell L. Rev. 1689, 1709 (2022)).  Although the relevant focus of the inquiry under *Bruen* is on the "Nation's historical tradition," 597 U.S. at 24, we begin with our own.

Virginia's founders determined at independence that "the common law of England" and "all statutes or acts of parliament made in aid of the common law" before 1607 (the fourth year of the reign of James I), "and which are of a general nature, . . . shall be the rule of decision, and shall be considered in full force, until the same shall be altered" by the General Assembly.  1776

Va. Acts ch. 5, § 6.  In 1792, the General Assembly repealed the portion of the 1776 ordinance that received "any statute or act of parliament."  1792 Va. Acts ch. 79, § 3, reprinted in 1 *Samuel Shepherd, Statutes at Large of Virginia* 199-200 (1835).  The 1792 law explained that "the good people of this commonwealth may be ensnared by an ignorance of acts of parliament, which have never been published in any collection of the law."  *Id.*, § 2.  It also noted that the General Assembly "during their present session" had enacted "such of the said statutes as to them appear worthy of adoption."  *Id.*  The common-law reception statute has remained on the books ever since and is currently found in Code § 1-200.[13]

Virginia's reception of English common law at our founding included the rules for defining and punishing felonies.  The Court in *Barker v. Commonwealth*, 4 Va. (2 Va. Cas.) 122 (1817), citing Blackstone, explained that the "forfeiture of lands or goods, or both, is, by the Common Law, essential to the offence so termed; insomuch that if a new crime, either in England or in Virginia, before the year 1789, was created by Statute, and declared thereby to be a felony, forfeiture would immediately attach thereto."  *Id.* at 123.  The punishment of death "would also attach thereto, not because the word felony . . . had any reference to capital punishments, but because all felonies, with a few exceptions only . . . (which exceptions serve to prove the rule[]) were by the Common Law so punished."  *Id.*

Both before and after independence, the Virginia General Assembly, like Parliament, enacted numerous laws imposing the death penalty "without benefit of clergy" on persons convicted of forgery.[14]  A handful of forgery crimes that did not carry the death penalty

---

[13] Our Supreme Court has not yet determined whether the precise date for the reception of English common law is 1776 or 1792.  *See White v. United States*, 300 Va. 269, 277 n.5 (2021).  The exact date does not matter here.

[14] *See* 1765 Va. Acts ch. 18, § 68 (tobacco stamps and receipts); 1777 Va. Acts ch. 4, § 5 (certificate of money); 1779 Va. Acts ch. 13, § 6 (land-office warrants); 1779 Va. Acts ch. 24 (government bills of credit and treasure notes); 1782 Va. Acts ch. 52, § 6 (inspection stamps for

nevertheless required the offender to, among other things, "forfeit his whole estate, real and personal," and be indentured to military service "without wages" for a term not exceeding seven years.[15] In 1789, as mentioned in *Barker*, the General Assembly softened the forfeiture penalty for felonies without benefit of clergy, providing that the offender's assets would no longer be forfeited to the Commonwealth but would pass to the offender's heirs as if the offender had died intestate. 1789 Va. Acts ch. 30, § 13.

Most of our sister States after independence also continued to impose the death penalty for various forgery crimes.[16] Significantly, that list includes States that adopted constitutions at the founding that included provisions addressing militias or firearm rights.[17] A compilation of Maryland laws published in 1799—eight years after the Second Amendment was ratified— identified five different forgery laws, all of which required the offender to "suffer death as a felon, without benefit of clergy." Thomas Herty, *Digest of the Laws of Maryland* 255-56 (1799).

Our dissenting colleague points out that Connecticut and Massachusetts did not impose the death penalty for forgery, but that is immaterial. That two of the original States did not impose the maximum punishment for forgery fails to show a widely held belief in the Founding

---

flour and hemp); 1783 Va. Acts ch. 10, § 35 (tobacco stamps and receipts); 1784 Va. Acts ch. 69 (government certificates and warrants); 1789 Va. Acts ch. 19 (testamentary documents and promissory notes).

[15] *See* 1777 Va. Acts ch. 2, § 18 (certificates of money); 1777 Va. Acts ch. 5, §§ 4, 9 (loan certificates); 1777 Va. Acts ch. 11 (certain government warrants and drafts).

[16] *See, e.g.*, 1776 Del. Acts ch. 45 at 366; 1792 Ga. Acts 35; 1778 Md. Acts ch. 17; Act of Feb. 8, 1791, reprinted in *Laws of the State of New Hampshire* 243, 246 (1792); 1780 N.J. Acts ch. 208, § 1, reprinted in *Acts of the General Assembly of the State of New Jersey* 136, 137 (Peter Wilson ed. 1784); 1784-85 N.Y. Laws ch. 88; 1777 N.C. Acts ch. 12, § 10; Act of March 21, 1783, reprinted in 11 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 81, 89 (1906); 1780 R.I. Laws 46, 51; 1783 S.C. Laws 17, § 2.

[17] *See* Mass. Const. of 1780, pt. I, art. XVII (1780); N.C. Const. of 1776, Declaration of Rights, art. XVII (1776); Pa. Const. of 1776, Declaration of Rights, art. XIII (1776); Va. Const. of 1776, Declaration of Rights § 13 (1776).

Era that imposing the death penalty for forgery exceeded the power of State government. We should not "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed." *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring).

Like most of its sister States, Virginia continued to enact laws that imposed the death penalty on forgers even after the States ratified the Second Amendment in 1791. The very next year, the General Assembly enacted a law condemning anyone who forged a tobacco certificate to "suffer death." 1792 Va. Acts ch. 18, § 41. Two years later, the legislature consolidated various Virginia forgery laws, providing that the offender upon conviction "shall suffer death as a felon without benefit of clergy." 1794 Va. Acts ch. 18, § 1.

It was not until 1796 that Virginia eliminated the death penalty for "free persons" for most felonies except "first degree" murder, broadly defined. *See* 1796 Va. Acts ch. 2 (codified at Code (1803), ch. 200, at 355).[18] That statute also abolished the "dispensation from punishment by benefit of clergy." *Id.*, § 13.[19]

*The federal government*

The federal government kept forgery as a capital offense for nearly three decades longer than Virginia. In 1790—after Congress had approved the Bill of Rights but before ratification by the States—Congress enacted a statute imposing the death penalty on anyone who forged or

---

[18] One section of the statute imposed a prison term of 4 to 15 years for forging or counterfeiting "any gold or silver coin" in circulation or "notes of the banks of Alexandria or the United States." 1796 Va. Acts ch. 2, § 9. But the statute did not address other forgery crimes.

[19] Citing the Third Circuit's en banc decision in *Range*, 124 F.4th at 227, Orange mistakenly suggests that Virginia eliminated the death penalty for forgery before 1796. *See* Orange Br. 18; Orange Reply 8. The court in *Range* erred in claiming that Virginia "at the Founding" had eliminated the death penalty for "forgery and counterfeiting." 124 F.4th at 227. *Range* mistakenly relied on an 1803 compilation of Virginia laws, *id.* at 227 n.4, overlooking Virginia's earlier statutory history canvassed above.

counterfeited any certificate or public security of the United States. Act of Apr. 30, 1790, ch. 9, § 14, 1 Stat. 112, 115. The law provided that "the benefit of clergy shall not be allowed." *Id.*, § 31, 1 Stat. 119. The death penalty for forgery and counterfeiting remained in place until 1825. *See* Act of March 3, 1825, ch. 45, §§ 17-18, 20, 4 Stat. 115, 119-21 (punishing various forgery crimes with "imprisonment and confinement to hard labour, not exceeding ten years"); *id.*, § 25, 4 Stat. 122 (repealing prior inconsistent laws); *Wynne v. United States*, 217 U.S. 234, 241 (1910) (noting that the 1790 act "was remolded by" the 1825 act).

3. *The death penalty for forgery at the founding extended to forgery of nonpublic records.*

Citing *Campbell v. Commonwealth*, 246 Va. 174 (1993), Orange asserted for the first time at oral argument here that Founding Era forgery laws imposed the death penalty only for forging *public* records, not other records. Orange was convicted of violating Code § 18.2-172, which provides:

> If any person forge any writing, *other than such as is mentioned in §§ 18.2-168 [forgery of a public record] and 18.2-170 [forgery of a coin or bank note]*, to the prejudice of another's right, or utter, or attempt to employ as true, such forged writing, knowing it to be forged, he shall be guilty of a Class 5 felony.

(Emphasis added). Orange argued that the founders would not have thought the death penalty warranted for a person who forged only a nonpublic record.

We are not persuaded. To start, *Campbell* does not support Orange's claim. The issue there was whether the offense of forgery of a public record in violation of Code § 18.2-168 required proof of harm or prejudice to the rights of another. *Campbell*, 246 Va. at 176. After surveying 18th century English common law, the Court said that "forgery of *both* public records and private papers was a common-law crime in England." *Id.* at 179 (emphasis added). But *Campbell* determined that common-law forgery of a private record required proof of harm to

another while forgery of a public record did not. *Id.* at 180-81. The Court concluded that the General Assembly had codified that distinction in 1819. *Id.* at 181-83.

*Campbell* did not address how forgery of nonpublic records was punished at the founding; that question was not implicated. The opinion made a passing reference that "[t]he common-law crime of forgery of public records, a capital offense in England, was augmented by statutes punishing the lesser offense of forgery of certain private documents." *Id.* at 180. But that dictum does not tell us how forgery of nonpublic records was punished.

While most of the Founding Era statutes canvassed above involved forgery of public records, the death penalty was also imposed at the founding as punishment for forging various other records as well. In 1711, Parliament imposed the death penalty without benefit of clergy on persons who forged instruments to transfer or sell the stock of a company.[20] It extended that penalty in 1722 to persons using forgery to impersonate the proprietor of a company to receive or transfer annuities, stocks or dividends.[21] In 1729, Parliament imposed the death penalty without benefit of clergy on first offenders who forged testamentary instruments, promissory notes, and other financial instruments.[22] Writing in 1769, Blackstone catalogued these and other English statutes, concluding that "through the number of these general and special provisions, there is now hardly a case possible to be conceived, wherein forgery, that tends to defraud . . . is not

---

[20] An Act to prevent the Mischiefs by forging Powers to transfer such Stocks, or to receive such Annuities or Dividends as are therein mentioned, or by fraudulently personating the true Owners thereof, and to rectify Mistakes of the late Managers for taking Subscriptions for increasing the Capital Stock of the South Sea Company, 8 Geo. I ch. 22, § 1 (1711) (Eng.).

[21] An Act for the more easy assigning or transferring certain redeemable Annuities, payable at the Exchequer, by Endorsements on the Standing Orders for the same, 9 Geo. I ch. 12, § 4 (1722) (Eng.).

[22] An Act for the more effectual preventing and further Punishment of Forgery, Perjury and Subornation of Perjury; and to make it Felony to steal Bonds, Notes or other Securities for Payment of Money, 2 Geo. II ch. 25, § 1 (1729) (Eng.).

made a capital crime." 4 Blackstone, *supra*, at 246-47. As already noted, the 1832 act of Parliament that abolished the death penalty for most forgery crimes kept that penalty in place for forgery of wills and other testamentary writings. 2 & 3 Will. 4 ch. 123. The death penalty for those offenses was not repealed until 1837. 7 Will. 4 & 1 Vict. ch. 84.

In Virginia, a 1789 law imposed "death as a felon without benefit of clergy" on persons convicted of forging any "deed, will, testament, bond, . . . [or] promissory note for payment of money. . . with intention to defraud any person." 1789 Va. Acts ch. 19. The statute was similar to one enacted in New York the year before. *See* 1788 N.Y. Laws ch. 20. Georgia enacted a similar law in 1792, the year after the Second Amendment was ratified. 1792 Ga. Acts 35. Virginia reenacted the same offense two years later—also punishable by "death as a felon without benefit of clergy." *See* 1794 Va. Acts ch. 28. And South Carolina followed suit in 1801. *See* 1801 S.C. Laws 37. All those statutes imposed the death penalty for forging a promissory note.

While our colleague argues in dissent that forgery of deeds and testamentary instruments qualifies as "public records" forgery under Code § 18.2-168—an issue we do not decide[23]— promissory notes are not public records under that statute. Our Supreme Court held in 1854 that forging the endorsement on a promissory note was covered by the predecessor to the "other writings" forgery statute in Code § 18.2-172, the same statute under which Orange was convicted. *See Powell v. Commonwealth*, 52 Va. (11 Gratt.) 822, 829 (1854) (affirming conviction under Code of 1849, ch. 193, § 5).

In short, the historical record discredits Orange's assertion that the founders would not have countenanced the death penalty for persons convicted of forging nonpublic records.

---

[23] Our appellate courts have not decided whether forgery of deeds or testamentary instruments is punishable as forgery of "public records" under Code § 18.2-168, or forgery of "other writings" under Code § 18.2-172.

4. *Founding Era evidence controls the scope of firearm rights when such evidence conflicts with Reconstruction Era evidence.*

It is a fair question why our Second Amendment analysis here focuses on Founding Era laws that recognized the death penalty and property forfeiture as a permissible punishment for forgery (subsuming the loss of firearm rights), rather than laws from the Reconstruction Era. After all, although the Second Amendment was ratified in 1791, it was not made binding on the States until 1868, when "the Due Process Clause of the Fourteenth Amendment incorporate[d]" it. *McDonald*, 561 U.S. at 791. By that time, the States and the federal government had eliminated the death penalty and property forfeiture as a punishment for forgery. So why 1791 instead of 1868?

Although the Supreme Court declined to definitively answer the temporal question in *Bruen*, *Rahimi*, *Hemani*, or *Wolford*, it has made clear that because the Second Amendment codified a *preexisting* right, we must first examine Founding Era evidence. The Court has repeatedly referred to the Second Amendment as a *preexisting right* that was codified in the Bill of Rights. *See Bruen*, 597 U.S. at 20 ("'[I]t has always been widely understood that the Second Amendment . . . codified a pre-existing right.' The Amendment 'was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors.'" (second alteration in original) (quoting *Heller*, 554 U.S. at 599)); *id.* at 25 ("meant to codify a *pre-existing* right"); *Hemani*, 225 L. Ed. At 323 (same); *Wolford*, 225 L. Ed. 2d at 506 ("the preexisting right that the Amendment codified"). In that respect, the Second Amendment is like the other Bill of Rights provisions. Those provisions "were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities [that] we had inherited from our English ancestors, and [that] had from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897).

*Bruen* explained that "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). Courts must be careful "'not to go too far back into antiquity' . . . unless evidence shows that medieval law survived to become our Founders' law." *Id.* at 35 (quoting *Funk v. United States*, 290 U.S. 371, 382 (1933)). By the same token, however, courts "must also guard against giving postenactment history more weight than it can rightly bear." *Id.* The Court acknowledged its statement in *Heller* that "evidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represented a 'critical tool of constitutional interpretation.'" *Id.* (quoting *Heller*, 554 U.S. at 605). But *Bruen* qualified that statement by adding that "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

Still, the issues in *Bruen*, *Rahimi*, *Hemani*, and *Wolford* did not require the Court to address what happens if Founding Era evidence conflicts with that from the Reconstruction Era. In *Bruen*, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." 597 U.S. at 38. In *Rahimi*, Founding Era laws sufficed to answer the question, so the Court did not examine 19th century laws. 602 U.S. at 693-98. In *Hemani* and *Wolford*, the Court found the asserted historical analogues insufficient "at either point in time." *Hemani*, 225 L. Ed. 2d at 325 n.3; *Wolford*, 225 L. Ed. 2d at 514-16. *Bruen* and *Rahimi* acknowledged the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the

- 25 -

right against the Federal Government)." *Rahimi*, 602 U.S. at 692 n.1 (quoting *Bruen*, 597 U.S. at 37-38). But "[t]he Court has consistently reserved whether the relevant timeframe for assessing the Second Amendment's original meaning, as applied to the States, is 1791 or 1868." *Wolford*, 225 L. Ed. 2d at 522 n.7 (Barrett, J., concurring).

Among federal appellate courts, only the Third Circuit has definitively answered the question, holding that "the constitutional right to keep and bear arms should be understood according to its public meaning in 1791." *Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 441 (3d Cir. 2025), *cert. denied sub nom.*, *Bivens v. Second Am. Found.*, 2026 U.S. LEXIS 2891 (June 30, 2026). The court explained that although laws enacted through the 19th century "can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood," such evidence may not be used to contradict the original understanding. *Id.* at 441-42. Other federal appellate courts have not yet squarely addressed what to do when Founding Era evidence conflicts with that of the Reconstruction Era.[24]

---

[24] *Compare Frey v. City of New York*, 157 F.4th 118, 128 (2d Cir. 2025) (noting that the court has "not definitively answer[ed] the question"), *with Christian v. James*, 176 F.4th 189, 207 (2d Cir. 2026) (Menashi, J., concurring in part and dissenting in part) ("I would resolve the conflict in favor of 1791."); *compare Kipke v. Moore*, 165 F.4th 194, 207 (4th Cir. 2026) ("[W]e look beyond the Founding Era to determine whether our national tradition of firearm regulation supports a government's restriction today."), *petition for cert. filed* (Apr. 15, 2026) (No. 25-1324), *with id.* at 226 (Agee, J., concurring in part and dissenting in part) ("'[P]ost-ratification history [of the Fourteenth Amendment] can confirm a court's understanding of Founding-Era public meaning,' but the Supreme Court has drawn 'a firm line where later evidence "contradicts earlier evidence[.]"'" (second and third alterations in original) (quoting *Lara*, 125 F.4th at 441)); *compare also Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1116-17 (11th Cir. 2025) (en banc) ("[W]e need not and do not decide in this appeal how to address a conflict between the Founding-era and Reconstruction-era understandings of the right because the law of both eras restricted the purchase of firearms by minors."), *cert. denied sub nom.*, *Nat'l Rifle Ass'n v. Glass*, 2026 U.S. LEXIS 2914 (June 30, 2026), *with id.* at 1157 n.1 (Newsom, J., concurring) ("[W]hen the Founding-and Reconstruction-era sources point in different directions, the former has to prevail."). *See also Schoenthal v. Raoul*, 150 F.4th 889, 913 (7th Cir. 2025) (declining to decide "trickier issue . . . when Founding-era evidence and laws from later periods, such as Reconstruction, provide opposite signals about the contours of the Second Amendment"), *cert. denied*, 224 L. Ed. 2d 380 (2026).

We conclude that Founding Era evidence controls over conflicting evidence from later eras. Consider the opposite proposition; suppose that Reconstruction Era evidence has primacy. If that were correct, then one of two things would have to be true: either (1) the scope of the right to bear arms under the Second Amendment as applied to the States must have a *different* meaning from the one restricting federal power (the "dual-track incorporation" theory); or (2) the meaning of the Second Amendment as a restriction on federal power was itself *modified or updated* in 1868 when the Fourteenth Amendment was ratified (the "reverse incorporation" theory).[25]

Under current precedent, however, neither of those theories is viable.

The Supreme Court squarely rejected dual-track incorporation in *Ramos v. Louisiana*, 590 U.S. 83 (2020), which held that "the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally." *Id.* at 93. Before *Ramos*, Louisiana and Oregon were the only two States that permitted less than a unanimous jury verdict in criminal cases. *Id.* at 87. The Court held that those laws violated the Sixth Amendment because "incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government." *Id.* at 93. "So if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court." *Id.* The Court put it even more emphatically in *Timbs v. Indiana*, 586 U.S. 146 (2019): "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires." *Id.* at 150.

Citing *Ramos* and *Timbs*, *Bruen* made clear that the content of the Second Amendment as applied to the States is the same as applied to the federal government. Thus, despite that New

---

[25] We use the same names for those theories as Judge Porter. *See Koons v. Att'y Gen.*, 156 F.4th 210, 293 (3d Cir.) (Porter, J., concurring in the judgment in part and dissenting in part), *reh'g en banc granted and judgment vacated*, 162 F.4th 100 (3d Cir. 2025).

York was "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second," the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government." *Bruen*, 597 U.S. at 37.

The Court drove home that point in *Wolford*, cementing the plurality's view in *McDonald* that "the Second Amendment has the same meaning in all parts of the United States." *Wolford*, 522 L. Ed. 2d at 513. "It cannot give way to 'the spirit of Aloha' in Hawaii, any more than it can yield to the spirit of the Big Apple (*Bruen*) or the Windy City (*McDonald*)." *Id.* (quoting *State v. Wilson*, 543 P. 3d 440, 459 (Haw. 2024)). Nor is the Second Amendment different as applied to the federal government. As the Court explained, "virtually all the provisions of the Bill of Rights ha[ve] been held to apply equally to the Federal Government and the States." *Id.* at 505. The Second Amendment thus "embodies a uniform national standard," not "one that varies from one locale to another." *Id.* at 506.

The reverse-incorporation theory fares no better. That theory posits that the meaning of the right to bear arms was updated from the public understanding of the Second Amendment in 1791 to the public understanding when the Fourteenth Amendment was ratified in 1868. In other words, the Fourteenth Amendment not only incorporated the 1868 understanding of the right to bear arms, but reverse-incorporated the same understanding of the Second Amendment as a limitation on federal power. This "new way" to think about incorporation supposes that "[w]hen the people adopted the Fourteenth Amendment, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L. J. 1439, 1441 (2022).

The reverse-incorporation theory, however, conflicts with the text of the Due Process Clause itself, the constitutional precedent that binds us, and the contemporaneous statements of

the framers of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment provides that "*No State* shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1 (emphasis added). It says nothing about binding the federal government, let alone updating or modifying the meaning of the Bill of Rights to the public understanding of those rights as of 1868.[26] Professor Lash would ground the reverse-incorporation theory in the Fourteenth Amendment's Privileges and Immunities Clause.[27] Lash, *supra*, at 1441, 1448-49. So would Justice Thomas. *See McDonald*, 561 U.S. at 805-06 (Thomas, J., concurring in part and concurring in the judgment). But the Supreme Court rejected that basis for incorporating the Bill of Rights in the *Slaughter-House Cases*, 83 U.S. (16 Wall) 36, 77-78 (1873), and the Supreme Court saw "no need to reconsider that interpretation" in *McDonald*, 561 U.S. at 758 (plurality).

When interpreting other Bill of Rights provisions that have been incorporated against the States, the Supreme Court has looked to the public understanding of the scope of the right in the Founding Era, not the Reconstruction Era. For instance, when construing how the religion clauses of the First Amendment applied to State laws prohibiting aid to schools controlled by a church, the Court rejected as irrelevant various "no-aid" laws adopted "in the second half of the 19th century" by "more than 30 States." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020). The Court reasoned that such laws could not "establish an *early* American tradition." *Id.* (emphasis added). The Court found "no inconsistency in recognizing that [Reconstruction Era] evidence may reinforce an early practice but cannot create one." *Id.*

---

[26] The Fifth Amendment, ratified in 1791, already prohibited the federal government from enacting any law depriving a person "of life, liberty, or property, without due process of law." U.S. Const. amend. V.

[27] "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. . . ." U.S. Const. amend. XIV, § 1.

Similarly, when construing the scope of the Fourth Amendment as a restriction on State power, the Court has "look[ed] to the statutes and common law of *the founding era* to determine the norms that the Fourth Amendment was meant to preserve." *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (emphasis added). The Court rejected the relevance of treatises published after 1791 as probative of the meaning of the Fifth Amendment. *Gamble v. United States*, 587 U.S. 678, 701-02, 702 n.13 (2019). And when considering the scope of the Confrontation Clause in the Sixth Amendment, the Court looked to "English common law," which provided "[t]he *founding generation's* immediate source of the concept." *Crawford v. Washington*, 541 U.S. 36, 43 (2004) (emphasis added).

Nothing in *Bruen* warrants departing from that approach when interpreting the Second Amendment. To the contrary, *Bruen* "generally assumed that the scope of the protection applicable to the Federal Government and States is *pegged to the public understanding of the right when the Bill of Rights was adopted in 1791*." 597 U.S. at 37. That is why *Bruen* described "*Heller*'s interest in mid- to late-19th-century commentary []as *secondary*." *Id.* at 37 (emphasis added). "In other words, [such] 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established.'" *Id.* (quoting *Gamble*, 587 U.S. at 702).

Finally, we cannot help but observe that proponents of the reverse-incorporation theory have not identified contemporaneous evidence that those who drafted or ratified the Fourteenth Amendment said publicly that the amendment was updating the meaning of the Bill of Rights as a restriction on federal power. That omission is striking, given that one would expect to see the idea of reverse-incorporation expressed in contemporaneous debates if it had been intended. Professor Lash argues that Representative John Bingham—who drafted the Privileges and Immunities Clause—thought that it incorporated the Bill of Rights as against the States. Lash,

*supra*, at 1451 (citing Cong. Globe, 42d Cong., 1st Sess. app. at 84 (Mar. 31, 1871)). But Bingham never indicated that those rights would be modified from their 1791 meaning. To the contrary, he said that the rights of each citizen were "those guarantied [sic] to him *from the beginning*, but which guarantee has unhappily been disregarded by more than one State of this Union, defiantly disregarded, simply because of a want of power in Congress to enforce that guarantee." Cong. Globe, 39th Cong., 1st Sess. 429 (Jan. 25, 1866) (emphasis added) (Statement of Rep. Bingham). As Representative James Wilson put it, "We are establishing no new right, declaring no new principle. It is not the object of this bill to establish new rights, but to protect and enforce those [that] already belong to every citizen." Cong. Globe, 39th Cong., 1st Sess. 1117 (Mar. 1, 1866).

For all those reasons, we reject the dual-track incorporation theory as well as the reverse-incorporation theory. We read current precedent to require that when Founding Era evidence conflicts with later evidence about the scope of firearm rights protected by the Second Amendment, Founding Era evidence controls.

> 5. *The founders would have understood the Second Amendment to permit disarming persons convicted of forgery.*

The penalty of disarmament for the crime of forgery "fits within the regulatory tradition" familiar to the Founding Era because it is a "lesser restriction" than what the founders would have thought permissible. *Rahimi*, 602 U.S. at 699. As to "how" the forgery laws burdened the offender's "right to armed self-defense," *Bruen*, 597 U.S. at 29, disarmament was obviously subsumed within the punishment of execution and forfeiture of all property, real and personal.

That understanding is reinforced by the congressional debate in 1790 over the federal crime bill, which revealed the founders' belief that forgery should be a capital offense because offenders were too untrustworthy to remain in civil society. Representative Roger Sherman at first favored eliminating the death penalty for forgery and counterfeiting but relented,

"conced[ing] to the clause as it stood" after a persuasive speech by Representative Theodore Sedgwick. 2 Annals of Cong. 1521 (Apr. 7, 1790). Sedgwick "enlarged on the pernicious consequences of counterfeiting. He considered it as a crime against the most important interests of society, and of a peculiarly malignant tendency in the present and probable situation of the United States." *Id.* Sedgwick added that "[p]ersons addicted to forgery are seldom, if ever, reclaimed." *Id.* So "the security of the society, therefore, appears to depend on a capital punishment. The idea is strengthened when we reflect on the mischief and ruin which have already ensued from forgery." *Id.*

Representative Thomas Fitzsimons also opposed eliminating the death penalty for forgery, citing "the practice and experience of Great Britain." *Id.* He said that "the injurious and fatal consequences to credit which result from forgery are considered in England in so serious a point of light, that the bank pays notes which they know to be counterfeit. Hence the inexorable rigor of the laws of that country in cases of forgery." *Id.* When Sherman responded that "he had known persons who had been convicted of this crime, [who] had afterwards reformed," *id.*, two other representatives disagreed. Representatives William L. Smith and Aedanus Burke warned of "the injuries which society was liable to from the ingenuity of these unprincipled persons; the extreme difficulty of guarding against their depredations, rendered it highly expedient they should be cut off." *Id.*

Orange counters that just because a felon at the founding might have been executed for a forgery conviction would not justify denying constitutional rights today to a felon who has completed his sentence. Reply Br. 9-11. Then-Judge Barrett offered a similar critique in 2019: "[t]he obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their

sentences, and returned to society." *Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019) (Barrett, J., dissenting).

But "[t]hat argument cannot be squared with *Rahimi*, which also relied on a greater-includes-the-lesser theory in holding that 'if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament . . . is also permissible.'" *United States v. Hunt*, 123 F.4th 697, 706 (4th Cir. 2024) (quoting *Rahimi*, 602 U.S. at 699), *cert. denied*, 145 S. Ct. 2756 (2025); *see also Watson*, 171 F.4th at 1024 ("[U]ntil the Supreme Court provides further guidance, the 'greater includes the lesser' theory fortifies that conclusion."). "As the Supreme Court has explained, the Second Amendment 'codified a *pre-existing* right.' And 'it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.'" *Hunt*, 123 F.4th at 706 (first quoting *Heller*, 554 U.S. at 592; and then quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)).

Other historical analogues support the inference that the founders understood that those convicted of serious felonies like forgery should forfeit their firearm rights. Such laws included the "going armed" laws canvassed in *Rahimi*. *See* 602 U.S. at 693-94, 697-99. Virginia's "going armed" law in 1786 also prohibited appearing "with force of arms" before ministers of justice "doing their office." 1786 Va. Acts ch. 49 (codified at 1 Rev. Code ch. 140 (1819)). Offenders who violated that command were liable "to forfeit their armour to the Commonwealth and their bodies to prison, at the pleasure of a court." *Id.* In other words, even the *nonviolent* offense of appearing armed before a judicial officer warranted the inference that the offender could not be trusted to keep his weapons. *Id.*

Virginia's punishment of horse theft—a capital offense like forgery—is another Founding Era example of why the punishment for at least some nonviolent crimes was

- 33 -

understood to include disarmament.  In 1789, the legislature imposed the death sentence without benefit of clergy for, among other crimes, "the felonious stealing of any horse."  1789 Va. Acts ch. 22, § 1, reprinted in 13 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 30, 31 (1823).  The legislature extended the death penalty in 1792 to accessories to horse stealing, explaining that "a great number of persons make a trade to receive and buy of such felons" and "conceal such Offenders."  1792 Va. Acts ch. 101, reprinted in *Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force* 188 (1794).

The court in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025), found Virginia's punishment of horse theft to be "the closest colonial-era analogue to vehicle theft" and "often subject to the death penalty."  *Id.* at 468.  Those laws satisfy the *why* inquiry of *Bruen*, the court explained, because the laws "were 'justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law.'"  *Id.* at 469.  Most States and the federal government likewise punished forgery at the founding for the same deterrent purposes and to protect the public from criminals who could not be trusted to obey the law.  *Accord Hawker v. New York*, 170 U.S. 189, 197 (1898) ("[C]onviction of a felony is evidence of the unfitness of such persons as a class . . . ." (quoting *Foster v. Bd. of Police Comm'rs*, 102 Cal. 483, 492 (1894))).  In other words, the lesser-included punishment of disarmament for the serious but nonviolent crimes of forgery and horse theft would not have troubled the founders.

The founders also disarmed various categories of people who they believed could not be trusted to be loyal citizens, even those who committed no crime.  *See Watson*, 171 F.4th at 1021 ("[I]n pre- and post-Founding America, the tradition of disarming those viewed as dangerous to society continued.").  The Continental Congress "recommended" that the colonies "immediately

. . . cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies, against the hostile attempts of the British fleets and armies." 4 Journals of the Continental Congress, 1774-1789, at 205 (1906) (Resolution of Mar. 14, 1776). Massachusetts, Virginia, and Pennsylvania all did so. *See* Joseph Blocher & Caitlan Carberry, Historical Gun Laws Targeting "Dangerous" Groups and Outsiders, in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* 131, 136 (Joseph Blocher et al. eds., 2023). Virginia's statute directed justices of the peace who administered the oath "forthwith to cause such recusants to be disarmed" who declined to swear it. 1777 Va. Acts ch. 3, reprinted in 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 281, 282 (1821).

After independence, Massachusetts required that anyone pardoned for having participated in Shays' Rebellion, even for having "given . . . counsel, aid, comfort or support, voluntarily, with intent to encourage the opposition to Government," be disarmed for at least three years. Act of Feb. 16, 1787, 1787 Mass. Acts 555, 555-56. If they "ke[pt] the peace" for the duration, they could appear before a court to regain their gun rights upon a showing that they "possess an unequivocal attachment to the Government." *Id.* at 556.

That is not all. As various appellate courts have noted, "[r]eligious minorities, political dissenters, Native Americans, and persons of color were among the disfavored groups that historical legislatures disarmed based on a perception that persons in those categories were inherently dangerous or non-law-abiding." *Zherka v. Bondi*, 140 F.4th 68, 85 (2d Cir. 2025), *cert. denied*, 223 L. Ed. 2d 555 (2026); *Watson*, 171 F.4th at 1021 (same). To be sure, "this sad tradition includes laws repugnant by today's standards," laws that would be struck down as unconstitutional on other grounds. *Watson*, 171 F.4th at 1022; *see also Zherka*, 140 F.4th at 85

(same). But "one can accept that the framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusions about which groups qualify as such." Blocher, *supra*, at 135. "To disregard [such laws] in favor of the more reassuring laws disarming violent criminals risks, as Justice Scalia famously put it in another context, 'looking over a crowd and picking out your friends.'" *Id.* (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 36 (1997)).

Although such laws are and were "abhorrent[,] . . . what is relevant to the Second Amendment analysis is whether the categorical disarmament of individual members of those groups for reasons other than demonstrated dangerousness was viewed as consistent with the right. It was." *Fooks v. State*, 337 A.3d 83, 107 (Md. 2025) (footnote omitted), *cert. denied*, 224 L. Ed. 2d 4 (2026). So "for this analysis their import cannot be ignored." *Watson*, 171 F.4th at 1022.

Such historical analogues do not need to be "a 'dead ringer' or a 'historical twin,'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30), to modern felon-in-possession laws. It is enough that they are "'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (alteration in original) (quoting *Bruen*, 597 U.S. at 29 & n.7). "Group disarmaments were often based on similar concerns, as the 'historical record suggests that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms, not merely to address a person's demonstrated propensity for violence.'" *United States v. Dubois*, 139 F.4th 887, 897 (11th Cir. 2025) (Pryor, J., concurring) (quoting *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024) (Colloton, C.J.)), *cert. denied*, 145 S. Ct. 2708 (2026).

In sum, the historical evidence shows that the Commonwealth has satisfied its burden at Step 2 of *Bruen* to justify disarming persons convicted of forgery, a felony punishable at the founding by death and forfeiture of property. We do not reach whether other nonviolent felonies that were not as severely punished in the Founding Era could justify disarmament.[28]

   *D. We do not reach whether Orange's loss of firearm rights is permanent or temporary.*

Our resolution of this appeal also makes it unnecessary to reach Orange's claim that a permanent restriction on her firearms rights is materially different from a temporary one. Orange Reply 1, 6, 9. Notably, however, Orange has failed to establish that her loss of firearm rights is, in fact, "permanent."

In opposing certiorari in Second Amendment cases, the United States has explained that the Attorney General has reinvigorated the process under 18 U.S.C. § 925(c) to restore firearm rights to persons previously convicted of crimes punishable by incarceration for more than one year. *See, e.g.*, Brief for the United States in Opposition at 6-8, *Zherka v. United States*, No. 25-269 (U.S. Nov. 2025).[29] The United States insists that this process fully addresses any Second Amendment concerns for persons whose convictions have resulted in the loss of firearm rights:

---

[28] We also do not reach whether the automatic loss of firearm rights is a disproportionate punishment under the Eighth Amendment for a nonviolent felony conviction. *Compare Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016) ("Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment and goes far beyond the manner of determining a defendant's sentence."), *with Cheripka v. Commonwealth*, 78 Va. App. 480, 506 (2023) (declining "to engage in a proportionality review in cases that do not involve life sentences without the possibility of parole"). Because Orange has never contended that her loss of firearm rights upon her conviction of forgery violated the Eighth Amendment, we do not consider that argument here.

[29] The rights-restoration process had not been effective before because the Attorney General had delegated the task of investigating applicants to the Bureau of Alcohol, Tobacco and Firearms, and Congress had blocked funding for ATF to carry out those responsibilities. *See generally Focke v. Commonwealth*, 77 Va. App. 366, 369-70 (2023). But the Attorney General withdrew that delegation in March 2025 and has begun to review and grant applications to restore firearm rights. *See* Withdrawing the Attorney General's Delegation of Authority, 90 Fed. Reg. 13,080 (Mar. 20, 2025); Granting of Relief; Federal Fire-Arms Privileges, 90 Fed. Reg.

> By providing a mechanism through which convicted felons can regain their ability to possess firearms and can challenge any ensuing denials of relief on an as-applied basis in court, upon a record that covers the individual applicant's circumstances, Section 925(c) *addresses any constitutional concerns* about the breadth and duration of the restriction imposed by Section 922(g)(1).

*Id.* at 7 (emphasis added).[30] The United States also contends that applying to the Attorney General is "more workable . . . for restoring firearm rights than would a court-administered regime of as-applied challenges." *Id.* Federal courts too have begun to cite that mechanism to show that "felon status does not necessarily mean permanent disarmament." *Watson*, 171 F.4th at 1025. Virginia also permits felons to petition for their firearm rights to be restored after first having their civil rights restored by the Governor. *See* Code § 18.2-308.2(C).

Because the record is silent on any efforts by Orange to take advantage of those mechanisms, however, we simply assume without deciding that her loss of firearm rights is "permanent," not temporary. We express no opinion about whether the ability of convicted felons to apply to have their firearm rights restored alleviates Second Amendment concerns.

CONCLUSION

The trial court did not err in denying Orange's motion to dismiss her felon-in-possession indictment on Second Amendment grounds. The historical inquiry compelled by *Bruen* shows that the founders who ratified the Second Amendment understood that forgery, though a nonviolent crime, could be punished by death and forfeiture of all property. That punishment

---

17,835 (Apr. 29, 2025); Granting of Relief; Federal Fire-Arms Privileges, 91 Fed. Reg. 8532 (Feb. 23, 2026).

[30] The United States has repeated that position multiple times. *See, e.g.*, Brief for the United States in Opposition at 6, *Jackson v. United States*, No. 24-6517 (U.S. Apr. 2025); Brief for the United States in Opposition at 9, *Vincent v. United States*, No. 24-1155 (U.S. Aug. 2025).

necessarily subsumed the loss of firearm rights, and disarmament is consistent with the purpose of Founding Era laws punishing such serious but nonviolent felonies.

*Affirmed.*

Causey, J., dissenting.

While the wisdom of *Bruen*[1] may very well be something the Nation lives to regret,[2] if we lower courts are bound to apply it, we must apply it *equally*—not by cherry-picking historical facts to support disarmament of certain, targeted communities. While I would never advocate for firearms to be readily accessible to every person in every circumstance,[3] we cannot allow for categorical or status-based encroachments on civil liberties. Nor are we bound to do so. *See United States v. Hemani*, 225 L. Ed. 2d 314, 322 (2026) ("[W]hen the government crosses the line from permissible regulation into unconstitutional infringement, courts have a duty to say so in the cases before them—no less in the Second Amendment context than in any other." (citing *District of Columbia v. Heller*, 554 U.S. 570, 606 (2008))).

The history and tradition of disarmament laws have focused on disarming only those individuals who have proven themselves incapable of safely bearing a weapon. Without any evidence that Orange presents such "individual markers of risk," permanently barring her possession of a shotgun violates her Second Amendment rights. *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).

---

[1] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

[2] While *Bruen* is not the problem of this particular day, nothing in my dissent should be construed to suggest that the Court's 2022 decision is without its faults. *See United States v. Hemani*, 225 L. Ed. 2d 314, 339 (2026) (Jackson, J., concurring) ("In a future case that squarely presents the question, we should consider whether to retire the failed *Bruen* experiment and return to an explicit assessment of Congress's ends and means when deciding the constitutionality of firearm restrictions."); *United States v. Rahimi*, 602 U.S. 680, 706 (2024) (Sotomayor, J., concurring) (emphasizing "*Bruen*'s myopic focus on history and tradition, which fails to give full consideration to the real and present stakes of the problems facing our society today"); *Bruen*, 597 U.S. at 102-03 (Breyer, J., dissenting) ("Although I agree that history can often be a useful tool in determining the meaning and scope of constitutional provisions, I believe the Court's near-exclusive reliance on that *single* tool today goes much too far." (emphasis added)).

[3] *See generally Bruen*, 597 U.S. at 83-102 (Breyer, J., dissenting) (detailing comparative statistics of the United States's gun violence epidemic).

To say, as the majority does, that *all* persons convicted of nonviolent forgeries are inherently dangerous is to live in a society devoid of second chances. Unwilling to accept that principle, I respectfully dissent.

I. History and Tradition

Turning to the history and tradition of our nation, disarmament laws have intended to keep firearms out of the hands of dangerous individuals. *See United States v. Rahimi*, 602 U.S. 680, 690 (2024); *Hemani*, 225 L. Ed. 2d at 330-31. At oral argument, the Commonwealth *conceded* not only that Rebecca Sue Orange is not a dangerous individual but that the forgery of a private document, for which she was convicted, is not a dangerous crime. *See* Oral Arg. 26:10 ("I agree that [forgery] *does not indicate an underlying dangerous personality*, but I think when you have someone convicted of a felony they have demonstrated that they are willing to disregard the commonwealth's laws and we have many laws that regulate the use of firearms."). *See also* Oral Arg. 24:25-26:30 (full discussion of dangerousness standard). Though the government carries the burden of showing the person being disarmed is dangerous, *Hemani*, 225 L. Ed. 2d at 332, the majority ignores the Commonwealth's concession, arguing that Orange is categorically dangerous on the sole basis of her previous felony conviction.

The majority asks whether a rule that disarms a person convicted of a Class 5 forgery under Code § 18.2-172 is "consistent with the Nation's historical tradition of firearm regulation." Identifying no actual disarmament laws in our nation's history, the majority turns to a so-called lesser-included-punishment theory, detailing a handful of English and Founding-era laws that possibly allowed for the government to put to death those guilty of some forgeries. But the majority opinion inappropriately analogizes to statutes that would today criminalize Class 4 forgeries of public documents, instead of analogizing to statutes that would have criminalized Orange's Class 5 forgery of private documents. And the majority fails to discuss important

Founding-era statutes that analogize to forgery of a private document and did *not* call for the death penalty, seemingly disregarding statutes that do not serve the policy preferences kept by my colleagues.

A. Disarmament Laws in Virginia and Elsewhere

America's history of disarmament laws, as the Supreme Court underscored in *Rahimi*, suggests that, for new regulations to be upheld as constitutional, they must be limited to disarming only *dangerous* individuals. *See Rahimi*, 602 U.S. at 694-98 (noting that the history of "going armed" and "affray" laws disarming only those who "pose[] a clear threat of physical violence to another"); *Hemani*, 225 L. Ed. 2d at 327 (noting that relevant historical analogues protected the public from "categorically violent and unusually dangerous persons"). A survey of the history of disarmament laws shows three types of dangerousness being regulated in the history and tradition of the Second Amendment: (1) threats of "immediate personal violence," i.e., those crimes resulting in death, like murder and aggravated assault; (2) the danger posed by "external threats," i.e., foreign actors waging war; and (3) the danger posed by a tyrannical or "unjust ruler." Jamie G. McWilliam, *A Classical Legal Interpretation of the Second Amendment*, 28 Tex. Rev. L & Pol. 125, 151-58 (2023).[4] Forgery of private documents falls outside of these categories, as it threatens no physical harm and does not involve government interests or otherwise shroud the government in conspiracy.

---

[4] The majority cites multiple statutes that echo these three categories of dangerous crime, rather glibly repackaging them as general forgeries. *See* 18 U.S.C. § 1546 (forgery related to international terrorism); 5 Geo. 3 c.12, §§ 18-19 (Eng.) (Stamp Act of 1765). We must look to the specific forgery of Rebecca Orange, a Class 5 forgery of private documents, not heightened or extreme types of forgeries that today would never be charged at the state level, much less classified as a Class 5 felony. *See Range v. Att'y Gen. U.S. of Am.*, 69 F.4th 96, 104-05 (2023) (noting the government cannot "analogize those [broad] groups to Range and *his individual circumstances*" (emphasis added)).

*1. English Common Law*

To start, it is worth noting that the *Bruen* Court weighed pre-ratification English common law only as a tertiary consideration,[5] noting that "English common-law practices and understandings at any given time in history cannot be *indiscriminately* attributed to the Framers of our own Constitution." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 35 (2022) (emphasis added).[6] The Court repeatedly highlighted the importance of the Founding era, *see id.* at 21, 26 (emphasizing the "traditions of the *American* people"), and expressly weighed Reconstruction as a "secondary" consideration due to the Fourteenth Amendment's incorporation, *Heller*, 554 U.S. at 614, 609-19.

Even to the extent we do consider English common law, the majority opinion notes that, in 1776, Virginia's Founders determined that "all statutes or acts of parliament made in aid of the common law . . . shall be the rule of decision, and shall be considered in full force, until the same shall be altered" by the General Assembly. However, in 1792, one year after ratification of the

---

[5] The Supreme Court has not provided guidance on what we are to do if the English common law is at odds with Founding and Reconstructionist history. An objective reading of *Bruen* suggests that English common law is, at best, a tertiary consideration given the singular analysis of the common law but a repeated focus on 1791 and 1868. *See Bruen*, 597 U.S. at 27 ("The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868.").

[6] The *Bruen* Court emphasized that "not all history is created equal." 597 U.S. at 34. Citing *Heller*, 554 U.S. at 634-35, the Court noted,

> "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. . . . As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights.

*Bruen*, 597 U.S. at 34-35 (emphasis omitted) (quoting *Heller*, 554 U.S. at 634-35).

Second Amendment, the General Assembly repealed the relevant portion of the ordinance that adopted "all statutes or acts of parliament."  The majority does note that the pre-ratification law was repealed but fails to consider the legal effects of that action, essentially ignoring the decision of the General Assembly members one year after ratification.[7]

The majority's other interpretations of the English common law substitute broad assertions[8] for the aggregate of the English's firearms history, indiscriminately attributing general claims of the typical onto our specific inquiry into disarmament laws.  Had my colleagues endeavored into English disarmament, they would have found that the common law "allowed officers of the Crown broad powers to disarm English men on the basis of faith, [socioeconomic] class, or perceived '*dangerousness*.'"  Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 150 (2007) (emphasis added).

First, the bulk of English disarmament laws were adopted in an effort to subdue religious and political uprisings in the face of violent insurrection and "armed conspiracy" following or otherwise connected to the English Civil War.[9]  Joseph G. S. Greenlee, *Disarming the*

---

[7] The General Assembly ratified the Bill of Rights on December 15, 1791.  1791 Va. Acts 37.  Of the 185 delegates who served in the House in 1791, 103 served in the General Assembly in 1792.  *Compare Burgesses and Delegates*, House History (last visited May 16, 2024), https://history.house.virginia.gov/members?session=88, *with Burgesses and Delegates*, House History (last visited May 16, 2024), https://history.house.virginia.gov/members?session=89.  There seems to be no record of all 1791 or 1792 Senate members in attendance; however, we do know that the founding Senate often acquiesced to the House, knowing the real power rested in Virginia's lower house.  *See, e.g.*, R. Beeman, *The Old Dominion and the New Nation, 1788-1801* 33 & n.9 (1972).

[8] *See Tennessee v. Garner*, 471 U.S. 1, 13 (1985) ("[A]t a time when virtually all felonies were punishable by death."); 4 William Blackstone, *The Commentaries on the Laws of England* 95 (1769) (noting the punishment for *any felony* as "may be superadded [with the death penalty], according to the degree of guilt.").

[9] The 1650 law passed by Parliament following the beheading of Charles I instructed commissioners to repress "all Conspiracies, Designs, Practises, secret and suspitious Meetings of

*Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 8-10, 14-15,

22-23 (2024).  Insurrectionists were killing loyalists and setting fire to their homes, parading in

the streets armed, and plotting to kill the King of England—they were not nonviolent people

guilty of paper crimes, as the majority has suggested.  *Id.* at 15-18.  In fact, this violence is the

backdrop against which the English Bill of Rights was implemented.  *Id.* at 22-24, 30; *The*

*English Historical Review* 620 (Reginald L. Poole ed., 1915) (noting the English Bill of Rights

passed "[f]or the securing the Peace of the Kingdome in this Time of Imminent Danger against

the Attempts and Trayterous Conspiracies of evill disposed Persons"); Joyce Lee Malcolm, *To*

*Keep and Bear Arms: The Origins of an Anglo-American Right* 42, 122 (1994) (similar).  The

principles behind disarmament under the common law, then, were not to punish for the sake of

being non-law-abiding but to end violent rebellion.

And those few laws that were not an effort to target religious and political opponents

were passed to subdue dangerous people threatening the physical safety of the community.  As

noted in *Bruen*, William Hawkins, in a 1716 treatise, wrote that "no wearing of Arms is within

the meaning of [the Statute of Northampton, upon which Blackstone's writings were founded],

unless it be accompanied with such Circumstances as are apt to terrify the People."  597 U.S. at

45 (citing 1 Pleas of the Crown 136).  Hawkins clarified that "'Persons of Quality' were 'in no

---

disaffected persons" by securing those whom "they finde to be especially active and dangerous."
*An Act For Setling of The Militia of The Commonwealth of England* 931-32 (London, Edward
Husband & John Field 1650).  Those commissioners were "authorized and required to disarm
and secure (by Imprisonment or otherwise) all Papists, and other ill-affected persons" who
demonstrated they were "against this present Parliament or against this present Government."
*Id.* at 934.  *See also* 8 *Calendar of State Papers, Domestic Series*, 1655, at 43 (London,
Longmass & Co. Trubner & Co. 1881); *An Act for Ordering the Forces in the Several Counties
of this Kingdom*, 14 Car. 2. c. 3, § 13.  William Blackstone even acknowledged the disarmament
of Catholic insurrectionists, writing that such restrictions were necessary to "counteract" the
insurrectionists' "dangerous . . . spirit," which "foreigners who only judge from our statute-book
are not fully apprized of."  4 William Blackstone*, Commentaries on the Laws of England* 54-57
(Oxford, The Clarendon Press 1769).

Danger of Offending against this Statute by wearing common Weapons because, in those circumstances, it would be clear that they had no 'Intention to commit any Act of Violence or Disturbance of the Peace.'" *Id.* (citing T. Barlow, The Justice of Peace 12 (1745)).

Lastly, as a practical approach to history, it seems unlikely that the Founders would smile upon a court citing and transferring English history onto their intentions at the Founding, given the nation had only just recovered from the ravages of the Revolutionary War. *See* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 46-47 (1998) ("In Locke's influential *Second Treatise of Government,* the people's right to alter or abolish tyrannous government invariably required a popular appeal to arms. To Americans in 1789, this was not merely speculative theory. It was the lived experience of their age.").

### 2. Colonial Disarmament

The majority points to no colonial history of disarmament. A deep dive uncovered only disfavored laws enforced by the Crown against the colonists and one now-disfavored colonial law in place before 1776.

The colonies were under the command of the English Crown and, in the years leading to the war, the English tried to keep firearms out of the hands of the revolutionaries. *See* Greenlee, *supra*, *Disarming the Dangerous*, 16 Drexel L. Rev. at 74-76. The colonists were distressed about the impending disarmament. For instance, an officer from Mecklenburg County, Virginia warned that "the frequent impressment of arms from the people has well nigh disarmed the County. . . . The people hide their arms, and say they will risk their lives, rather than give up what few remain." *See* "An Act for the Better Supply of the Country with arms and ammunition" (1684), William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature*, vol. 3, 13 (1820). "As a consequence of this public resentment, colonial legislators approached the impressment of firearms with

discernable wariness." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 152 (2007). *See Bruen*, 597 U.S. at 45 ("And as that individual right matured, 'by the time of the founding,' the right to keep and bear arms was 'understood to be an individual right protecting against both public and private violence.'" (citing *Heller*, 554 U.S. at 594)).

The one colonial[10] disarmament law, oft-cited by Second Amendment scholars, is a Virginia law that allowed for the disarmament of Catholics. But even when the Commonwealth disarmed those unwilling to swear an oath to "the Protestant succession," Virginia still *exempted* "such necessary weapons as shall be allowed him by order of the justices of the peace at their court, for the *defense of his house and person*." *See* 1 George I, stat. 2, c. 13 (1714); "An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government" (1756), Hening, *supra*, *Statutes at Large*, vol. 7, 35-36. This Virginia history suggests that even those seen as outsiders to the "law-abiding" body politic were allowed weapons like shotguns for self-defense in the home.[11]

The colonists were so firmly against disarmament that even indentured servants, who some scholars have considered the most analogous to present-day probationers and parolees,

---

[10] In that it was adopted and enforced by a colonial government body, made up of colonists, as opposed to a law enforced by the Crown.

[11] *See* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L.P.P. 695, 707 (2009) (noting the Founding states also "avoided regulation of long guns" as they were seen as less dangerous than pistols, due to their inability to facilitate concealed carry). A 1925 compilation of then-current laws found that "no State banned possession of long guns based on a prior conviction . . . and that no State with a constitutional arms right had enacted such a law until 1925." *Id*. at 708 (citing *Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Thirty-Fifth Annual Meeting* 862-63 (1925)). "And it appears that no state court case considered any law of this type under a constitutional protection of arms until 1939, a century and a half after the Second Amendment's adoption." *Id.*

were not permanently disarmed in any of the thirteen colonies.[12]  *See, e.g.*, Greenlee, *supra*,

*Disarming the Dangerous*, 16 Drexel L. Rev. at 30-32 (comparing indentured servants to those

under state supervision after convictions for nonviolent felonies).  Some laws did temporarily

exempt indentured servants from militia duty but others, conversely, *required* them to serve.[13]

And many indentured servants were allowed, if not required, to bear arms once their servitude

was over.  *See, e.g.*, 2 Selective Serv. Sys., *Backgrounds of Selective Service: Military*

*Obligation: The American Tradition* pt. 4, at 14 (1947) (Georgia Enactments: 1755) (noting

"every Servant in this province, who Shall be Freed or discharged from his Service shall be

allowed Six Months time after such discharge to provide himself with the Arms and Furniture");

*id.* pt. 6, at 138 (Massachusetts Enactments: 1721) (requiring "three months' time . . . after his

time is out"); *id.* pt. 7, at 51 (New Hampshire Enactments: 1718) (requiring "[t]hree Months time

. . . after his time is out"); *id.* pt. 13, at 10 (South Carolina Enactments: 1703) (requiring "within

the time and space of twelve months after he or they shall be free and discharged").

    3.  *Founding Era Disarmament*

Founding-era disarmament laws focused on keeping firearms only out of the hands of

*dangerous* persons.  The Supreme Court has suggested that the Founding era spans from 1776

---

[12] *See, e.g.*, 2 *Selective Serv. Sys., Backgrounds of Selective Service: Military Obligation: The American Tradition* pt. 3, at 2, 27 (1947) (Delaware Enactments: 1741); *id.* pt. 4, at 20, 94, 132 (Georgia Enactments: 1755, 1773, and 1778); *id.* pt. 5, at 108 (Maryland Enactments: 1756); *id.* pt. 6, at 21 (Massachusetts Enactments: 1643); *id.* pt. 13, at 32, 45-46, 70 (South Carolina Enactments: 1721, 1747, and 1778); *id.* pt. 9, at 257 (New York Enactments: 1775); *id.* pt. 11, at 77 (Pennsylvania Enactments: 1780); *id.* pt. 14, at 84, 89, 94, 107, 115, 156, 216, 300, 327, 362, 435 (Virginia Enactments: 1723, 1727, 1738, 1748, 1755, 1775, 1777, and 1784).

[13] *See, e.g.*, 2 Selective Serv. Sys., *supra*, pt. 2, at 101 (Connecticut Enactments: 1715); *id.* pt. 4, at 111 (Georgia Enactments: 1773); *id.* pt. 5, at 8 (Maryland Enactments: 1654); *id.* pt. 6, at 47 (Massachusetts Enactments: 1647); *id.* pt. 7, at 38 (New Hampshire Enactments: 1697); *id.* pt. 8, at 51 (New Jersey Enactments: 1777); *id.* pt. 10, at 48 (North Carolina Enactments: 1774); *id.* pt. 11, at 10 (Pennsylvania Enactments: 1676); *id.* pt. 13, at 75 (South Carolina Enactments: 1778); *id.* pt. 14, at 14 (Virginia Enactments: 1777).

when our nation began to 1800, if not 1820. *See generally Hemani*, 225 L. Ed. 2d at 324 (analyzing laws "at the founding and in the decades following it," including statutes from 1812, 1829, 1838, and 1851); *Wolford v. Lopez*, 225 L. Ed. 2d 494, 512 (2026) (analogizing to gun rights statutes enacted in 1833, 1842, and 1852); *Rahimi*, 602 U.S. at 690-95 (analyzing laws from 1783 to 1800); *Bruen*, 597 U.S. at 37-55 (analyzing laws from 1786 to 1795); *Heller*, 554 U.S. at 601-04 (analyzing state constitutions from 1791 to 1820). Both this dissent and the majority have failed to identify any statute adopted within this timeline that permanently disarmed convicted criminals, as analyzed below.

### a. Proposals During Ratification

First, several proposals submitted during the ratification debates are worthwhile to our analysis, as they highlight the dangerousness principles considered by the Founders and underlying their understanding of the Second Amendment. Founders in Pennsylvania, New Hampshire, and Massachusetts proposed amendments to the Constitution that recognized an individual right to keep arms and limited that right only insofar as an individual was engaged in affray, rebellion, or terrorizing another.

New Hampshire's proposed language, "Congress shall never disarm any Citizen unless such are or have been in *Actual Rebellion*," supplied the broadest protection of the three proposals, suggesting the right could be restricted only after a person committed an act of levying war. 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891) (emphasis added). *See also* Greenlee, *supra*, *Disarming the Dangerous*, 16 Drexel L. Rev. at 74-76.

The Massachusetts proposal recognized the power to disarm violent people engaged in riot, affray, and other breaches of peace. Samuel Adams proposed to the Massachusetts ratifying convention that "the said Constitution be never construed to authorize Congress . . . to prevent

the people of the United States, who are *peaceable citizens*, from keeping their own arms." Neil H. Cogan, *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 181-82 (New York: Oxford University Press, 1997) (emphasis added)*; 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971). *See also* Greenlee, *supra*, 16 Drexel L. Rev. at 74-76.[14] At the time, "peaceable" was defined as "[f]ree from war; free from tumult"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773).

In December 1787, after Pennsylvania ratified the Constitution, 21 opponents signed the "Dissent of the Minority of the Convention" that gave "the people . . . a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." *See* Greenlee, *supra*, *Disarming the Dangerous*, 16 Drexel L. Rev. at 74. At first glance, the Pennsylvania Dissent was narrower than the other two proposals. However, the only dissenter who discussed the "crimes committed" provision suggested that the dissenters were worried about insurrectionists, not nonviolent criminals. *Id.* at 75.[15]

---

[14] Samuel Adams later withdrew his motion for the amendment, as he submitted it for consideration on the very day the convention was scheduled to vote on ratifying the constitution. Greenlee, *supra*, *Dismissing the Dangerous*, 16 Drexel L. Rev. at 77 ("Because his last-minute proposals 'alarmed' both federalists and antifederalists, Adams 'perceived the mischief he had made [and] withdrew his motion.'" (quoting "Letter from Jeremy Belknap to Ebenezer Hazard" (Feb. 10, 1788), *in 7 The Documentary History of the Ratification of the Constitution* 1583, 1584 (John P. Kaminski et al. eds. 2001)). The antifederalists resubmitted his proposal, but even Adams, worried it would tank the possibility of ratification, voted against it. *Id.* at 77-78.

[15] The discussion came from Swedish immigrant turned Pennsylvania preacher, Nicholas Collin, writing under the pseudonym Foreign Spectator. Stephen P. Halbrook, *The Right of the People or the Power of the State: Bearing Arms, Arming Militias, and the Second Amendment*, 26 Val. U. L. Rev. 131, 149-50 (1991) (citing Foreign Spectator, No. XI, Fed. Gazette, Nov. 28, 1788).

> Since disarmament had traditionally been based on dangerousness to that point, it is more reasonable to read "crimes committed" as covering violent crimes, and "real danger of public injury" as providing a catchall that covers violent acts not covered by the criminal law—which at the time was not nearly as expansive as today's laws.

*Id.*

Some believed that Adams's proposed amendment in Massachusetts was based on the Pennsylvania Dissent of the Minority. *Id.* at 78. In a letter, Jeremy Belknap of Boston, noted that Adams had a copy of the Dissent of the Minority and that his amendments "proposed to guard against" the "very things" the Minority "objected to." *Id.* (quoting "Letter from Jeremy Belknap to Ebenezer Hazard" (Feb. 10, 1788), *in 7 The Documentary History of the Ratification of the Constitution* 1583, 1583-84 (John P. Kaminski et al. eds. 2001)). For this reason, scholars do not believe the Founders interpreted the Pennsylvania dissent as disarming nonviolent offenders—at least not unanimously. *Id.* at 78.

These proposals suggest that the Founders considered the right to bear arms as excluding only those guilty of violent crimes. While none made it into the constitution, the proposals are important because even "*disputes* regarding the lawfulness of [firearm] prohibitions" should be considered in determining a regulation's constitutionality, as they provide insight into the public discourse around the Second Amendment. *Bruen*, 597 U.S. at 30 (emphasis added). And given the dangerousness standard underscored in these pre-ratification proposals, it appears that at least a plurality of the Founders would not have considered a forgery like Orange's enough for her to be disarmed at the Founding.

### b. Disarmament Laws At or Around Ratification

The disarmament laws in force at and shortly after 1791 echo these pre-ratification proposals. Only four state constitutions had Second Amendment analogues in 1791: Massachusetts, North Carolina, Pennsylvania, and Vermont—and none of these provisions

excluded persons convicted of a crime. *See Heller*, 554 U.S. at 601-03. Further, almost all of these firearm regulations, as discussed in *Bruen*, contended with violent or dangerous individuals, leading the Court to say, "A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." 597 U.S. at 50-51.

For example, a Massachusetts statute from 1795 commanded justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the *fear or terror* of the good citizens of this Commonwealth." 1795 Mass. Acts and Laws ch. 2, at 436, in *Laws of the Commonwealth of Massachusetts* (emphasis added). And an 1801 Tennessee statute likewise required any person who would "publicly ride or go armed to the *terror of the people*, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the *fear or terror of any person*" to post a surety; otherwise, any violation of law would be "punished as for a breach of the peace, or riot at common law." 1801 Tenn. Acts, at 260-261 (emphases added).

As the *Bruen* Court noted, disarmament was also based on an individual's dangerousness in the common law. 597 U.S. at 51. For instance, the Tennessee attorney general acted in vain when he "charged a defendant with the common-law offense of affray," on the theory that a man had "'arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause *terror to the people*' . . . with force and arms being arrayed in a warlike manner." *Id.* (emphasis added) (quoting *Simpson v. State*, 13 Tenn. 356, 358 (1833)). The Tennessee Supreme Court quashed the indictment, partly because it "did not think that it could attribute to the mere carrying of arms 'a necessarily consequent operation as terror to the people.'" *Id.*

This principle was built upon throughout the 19th century, creating a tradition of disarming *dangerous* individuals. The Tennessee Supreme Court echoed its previous holding in

1840. *See Aymette v. the State*, 21 Tenn. 154, 158-60 (1840) ("The citizens have the *unqualified* right to *keep* the weapon . . . . But the *right to bear* arms is not of that unqualified character. . . . it does not follow, that they may be borne by an individual, *merely to terrify the people*, or for purposes of private assassination." (emphases added)). Similarly to the Tennessee Supreme Court, in interpreting the common-law offense of affray, the North Carolina Supreme Court found "'that the carrying of a gun' for a lawful purpose 'per se constitutes no offence.'" *Bruen*, 597 U.S. at 52 (quoting *State v. Huntly*, 25 N. C. 418, 421-22 (1843) (per curiam)). Instead, "only carrying for a 'wicked purpose' with a 'mischievous result . . . constitute[d a] crime.'" *Id.* at 52-53 (internal citations omitted).[16]

    c. Virginia-Specific Disarmament Laws At or Around Ratification

Aside from the laws detailing the ins and outs of Virginia's militia,[17] there were few firearm regulations in Virginia before the turn of the nineteenth century. *See* Everett A. Martin Jr. & Nicholas W. Dudley, *A History of Firearms Regulation in Virginia Until 1873*, 71 Va. Law. 22, 22 (2022).

---

[16] Other state courts later followed suit, recognizing that the common law did not punish the carrying of deadly weapons *per se*, but only the carrying of such weapons "for the purpose of an *affray*, and in such manner as to *strike terror* to the people." *O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (emphases added). *See also State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900) (noting the Second Amendment right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others").

[17] When the Virginia convention voted for ratification, it voted on a declaration asking Congress to adopt the following into the Bill of Rights: "That the people have a right to keep and bear arms: that a well regulated militia composed of the body of the people trained to arms, is the proper, natural and safe defence of a free State." 10 The Documentary History of the Ratification of the Constitution of Virginia 1553 (1993); Martin & Dudley, *A History of Firearms Regulation in Virginia Until 1873*, 71 Va. Law. 22, 22, 23 (2022).

Between 1776 and 1873,[18] there were only three statutes regulating the right to bear arms. The first was the adoption of a version of the English Statute of Northampton, which outlawed "com[ing] before the justices of any court, or either of their ministers of justice, doing their office, with force and arms, on pain . . . in affray of the peace."[19] The Virginia statute, like the Statute of Northampton, modified "going or riding armed" with "in terror of the county." 1 Rev. Code (1819), c. 140, at 554; 1786 Va. Acts ch. 49. By 1791, the Virginia statute provided that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, *in terror of the Country*." Collection of All Such Acts of the General Assembly of Virginia, ch. 21, at 33 (1794) (emphasis added). The Founding-era history of disarmament in Virginia, then, begins with a law focused on dangerousness as the standard, not on nonviolent crime.

Of note, the majority attempts to analogize to this "going armed" law. But as discussed, the disarmament laws in Virginia and elsewhere were focused on disarming dangerous individuals who were engaged in affray, threatened the immediate physical safety of others, or armed themselves in furtherance of rebellion or insurrection. The Virginia going armed law falls squarely into that category. To compare carrying a loaded gun into a public building, in front of a public official—which is classified as a violent offense under Codes §§ 17.1-805(C) and

---

[18] Before 1776, in Virginia, there were *zero* laws regulating the right of white men to bear firearms. *See* Martin & Dudley, *supra*, *A History of Firearms Regulation in Virginia Until 1873*, 71 Va. Law. at 23. A number of statutes disarmed Black and Native Virginians and prohibited the trade of arms with those groups. *See id.* Because such race-based restrictions would be facially unconstitutional in 2026, a discussion of them would be gratuitous, if not deeply offensive to the rule of law.

[19] *See also* 2 Edw. 3, c. 3 (1328). In *Bruen*, interpreting the Statute of Northampton, the Court relied on an English decision and treatise to interpret this statute as a prohibition on wearing arms with the intent to terrorize people. *See* 597 U.S. at 32, 34-37. This interpretation is in line with the dangerousness standard in *Rahimi*. The Court also noted that, because the statute was "ancient," it was essentially "obsolete." *Id.* I mention it now only because the majority appears to rely on it and its progeny.

18.2-283, -283.1, and -283.2—to a nonviolent forgery is, frankly, to make a comparison without merit.

The second Virginia statute, a general prohibition on affray, banned "[a]ll assemblages of persons armed with fire-arms for purposes of drill or parade." 1 Rev. Code (1819) c. III, §§ 7, 8, at 423. This second statute echoed the first, attempting to prevent dangerous uses of firearms in the event of insurrectionist activity. *Id.* The third disarmament statute, codified by the General Assembly in 1838, prohibited concealed carry of "any pistol, dirk, bowie knife, or any other weapon of the like kind a weapon." 1838 Acts, p. 76, c. 101, § 1.[20]

These three laws cover Virginia's historic tradition of firearm regulation from the time of the Founding and shortly afterwards. Crucially, possession of a firearm by a person convicted of a felony—the law under which Orange was convicted and now appeals—was not adopted in Virginia until 1979, long after the Founding. *See* 1979 Acts ch. 474. The majority only briefly acknowledges this point and does so within a footnote.

### 4. Post-Ratification Founding-Era Disarmament Laws

Between 1789 and 1820, nine States adopted Second Amendment analogues into their state constitutions, all of which emphasized the importance of firearms in protecting oneself.[21] *See Rahimi*, 602 U.S. at 728-29 (Kavanaugh, J., concurring) ("Madison, Marshall, and Scalia made clear that courts should look to post-ratification history as well as pre-ratification history to

---

[20] Between the Founding era and Reconstruction, "the overwhelming focus of gun regulation in the States (there was none from the Federal Government) was on *carrying* weapons, particularly through laws against carrying them concealed . . . . States avoided the more extreme approach of banning *possession*." Marshall, *supra*, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L.P.P. at 707. The States also "avoided regulation of long guns." *Id.*

[21] Four of the states—Kentucky, Ohio, Indiana, and Missouri—conferred the right "to bear arms in defence of themselves and the State." *Heller*, 554 U.S. at 602. Mississippi, Connecticut, and Alabama constitutions conferred the "right to bear arms in defence of himself and the State." *Id.* at 602. Tennessee and Maine constitutions conferred the right in furtherance of the "common defence." *Id.* at 602-03.

interpret vague constitutional text.").[22]  None of the nine constitutions made an exception for

those convicted of nonviolent felonies like Orange.  *Id.*  The absence of an exception is crucial

because seven of those constitutions *did* explicitly disenfranchise people convicted of certain

crimes from the right to vote; these states contemplated which civil disabilities to impose on

those with nonviolent felonies and declined to include disarmament.  *Cf. City of Richmond v.*

*VEPCO*, 292 Va. 70, 75 (2016) ("[Courts] assume that the General Assembly chose, with care,

the words it used. . . ." (first alteration in original) (citations omitted)).

The majority spills much ink rationalizing why its 1791 analysis is the only one with

merit.  And yet, its argument is supported only by two of the eleven federal circuits that provided

relevant precedent before *Hemani*.[23]  Those two decisions, like the majority's narrow limitations

---

[22] "For more than two centuries—from the early 1800s to this case—this Court has . . . repeatedly employed post-ratification history to determine the meaning of vague constitutional text." *Rahimi*, 602 U.S. at 728-29.  Reliance on post-ratification history has spanned "all domains of constitutional law, every era of the nation's history, and Justices of every stripe."  *Id.* at 728 (citing *Trump v. Anderson*, 601 U.S. 100, 113-115 (2024) (*per curiam*)); *Moore v. Harper*, 600 U.S. 1, 22, 32-34 (2023); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535-36, 540-41 (2022); *Bruen*, 597 U.S. at 35-37, 50-70; *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75 (2022); *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474-77 (2022); *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 494-97, 508 (2021); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25, 432-34 (2021); *Torres v. Madrid*, 592 U.S. 306, 314 (2021); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 858-62 (2020); *Chiafalo v. Washington*, 591 U.S. 578, 592-97 (2020); *American Legion v. American Humanist Assn.*, 588 U.S. 19, 29, 58-66 (2019); *Zivotofsky v. Kerry*, 576 U.S. 1, 15-17, 23-28 (2015); *Town of Greece v. Galloway*, 572 U.S. 565, 575-79 (2014); *District of Columbia v. Heller*, 554 U.S. 570, 605-19, 626-28 (2008); *Crawford v. Washington*, 541 U.S. 36, 47-50 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 481-83 (2000); *Medina v. California*, 505 U.S. 437, 445-48 (1992); *Holland v. Illinois*, 493 U.S. 474, 481-82 (1990); *Marsh v. Chambers*, 463 U.S. 783, 786-92 (1983); *Dames & Moore v. Regan*, 453 U.S. 654, 678-82 (1981); *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 676-80 (1970); *Powell v. McCormack*, 395 U.S. 486, 522, 541-47 (1969); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 321-29 (1936); *The Pocket Veto Case*, 279 U.S. 655, 688-91 (1929); *Myers v. United States*, 272 U.S. 52, 155-58 (1926); *United States v. Midwest Oil Co.*, 236 U.S. 459, 469-75 (1915); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 683-92 (1892); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 279-80 (1856); *McCulloch v. Maryland*, 17 U.S. 316, 4 Wheat. 316, 400-01 (1819)).

[23] Aside from relying on the two federal circuit decisions, the majority asserts academic viewpoints or otherwise tangentially related theories to resolve in its favor the debate between

on what it means to be a Founding era law, would have precluded most of the *Hemani* Court's analysis. In the 39-page decision, the Court cited only seven statutes that were enacted at or before 1791, out of at least thirty statutes cited with years of enactment. *Hemani*, 225 L. Ed. 2d at 325-26, 327 n.4, 328 n.5. The majority does not grapple with the *Bruen*, *Rahimi*, *Hemani*, and *Wolford* Courts' own expanded boundaries of the Founding era. Instead, it is forced to argue a staunch 1791 end date; if forgery laws enacted as early as 1796 are proper analogues, the Commonwealth cannot prevail in this appeal.

All in all, the states and the federal government all repealed laws imposing capital punishment for forgery in the 1790s through 1852. Within the timeframe suggested by the Supreme Court and lower courts, more than 60 years elapsed—three generations—with no history or tradition of imposing the death penalty for forgery before the Fourteenth Amendment was ratified.

### 5. *Reconstructionist Disarmament*

The Supreme Court has emphasized the importance of Reconstruction-era analysis in the history and tradition test. Even if "secondary" to Founding-era principles, the Second Amendment is only applicable to the states by way of its incorporation into the Fourteenth Amendment, which demands *some* attention to the history of Reconstructionist firearm regulations. *Bruen*, 597 U.S. at 37.[24]

---

1791 and 1868 statutes—a debate the Supreme Court has not yet resolved. This Court, instead, should have merely done what the Supreme Court did in *Hemani*, looking to the history and tradition of the nation in a Founding era that spanned into the 1850s.

[24] *See also Bruen*, 597 U.S. at 60 ("[W]e think a short review of the public discourse surrounding Reconstruction is useful in demonstrating how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens.").

Throughout Reconstruction, disarmament laws continued to implement the dangerousness standard set forth during the Founding era. General D. E. Sickles issued an 1866 decree stating that, in South Carolina, "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed. . . . And *no disorderly person, vagrant, or disturber of the peace*, shall be allowed to bear arms." *Bruen*, 597 U.S. at 62-63 (emphasis added) (first citing Cong. Globe, 39th Cong., 1st Sess., at 908-09; and then citing *McDonald v. City of Chicago*, 561 U.S. 742, 847-48 (2010)). And, as the *Bruen* Court highlighted, a Freedmen's Bureau circular noted that "[a]ny person, white or [B]lack, may be disarmed if convicted of making an *improper or dangerous use of weapons*," even though "no military or civil officer has the right or authority to disarm any class of people, thereby placing them at the mercy of others." *Id.* at 63 (emphasis added).[25]

Additionally, Congress enacted the Freedmen's Bureau Act on July 16, 1866. Section 14 of the act stated: "[T]he right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens . . . without respect to race or color, or previous condition of slavery."

---

[25]  [I]n some parts of [South Carolina,] armed parties are, without proper authority, engaged in seizing all fire-arms found in the hands of the freedmen. Such conduct is in plain and direct violation of their personal rights as guaranteed by the Constitution of the United States, which declares that "the right of the people to keep and bear arms shall not be infringed." The freedmen of South Carolina have shown by their *peaceful and orderly conduct* that they can *safely be trusted* with fire-arms, and they need them to kill game for subsistence, and to protect their crops from destruction by birds and animals.

Joint Comm. on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, at 229 (1866) (Proposed Circular of Brigadier General R. Saxton) (emphases added).

14 Stat. 176-77.  *See also* Michelle Goodwin, *The Thirteenth Amendment: Modern Slavery, Capitalism, and Mass Incarceration*, 104 Cornell L. Rev. 900, 928-33 (2019).

In *Wolford*, the Court acknowledged this valuable Reconstructionist sentiment.  The Court highlighted "[t]he Republican Party Platforms of 1856 and 1860," writing, "the right to keep and bear arms was crucially important for vulnerable [B]lack[ people] during this period. And this was well-understood by the Republicans in Congress who were responsible for drafting, approving, and securing the ratification of the Fourteenth Amendment."  *Wolford*, 225 L. Ed. 2d at 516-17.

During the Reconstruction era, up to the turn of the twentieth century, there was no history nor tradition of disarming nonviolent felons.[26]  The majority neglects to bring Reconstruction—or any law after 1791—into its analysis, going so far as dismissing a 1796 law as outside of the Founding era.[27]  By ignoring the Reconstructionist period, the majority succumbs to the very error that Justice Scalia warned against: "looking over a crowd and picking out your friends."  Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 36 (1997).

    *6.  The Debate Over the End of the Founding Era*

There is no need to resolve the ongoing, unsettled debate of how to weigh Founding- and Reconstructionist-era statutes in the case before us today.  *See supra* ("*Bruen*, *Rahimi*, and *Hemani* did not require the Court to address what happens if Founding Era evidence conflicts

---

[26] In fact, the opposite might be closer to the truth.  *See* Marshall, *supra*, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L.P.P. at 710 ("The closest thing to a case considering a felon disability" in the 18th and 19th centuries was a Texas case invalidating an 1878 regulation "to the extent that it required forfeiting the offending pistol upon a conviction." (citing *Jennings v. State,* 5 Tex. Ct. App. 298, 300 (1878))).

[27] Of the 185 delegates in the General Assembly in 1791, 115 of them also served in 1796.

with that from the Reconstruction Era."). In including late-1790s and 1800s evidence as part of our Founding-era analysis, I merely apply the settled boundaries of the Founding era repeatedly established by the Supreme Court. *See Hemani*, 225 L. Ed. 2d at 324-26 (analyzing laws "at the founding and in the decades following it," including statutes from 1812, 1829, 1838, and 1851); *Wolford*, 225 L. Ed. 2d at 512 (analogizing to gun rights statutes enacted in 1833, 1842, and 1852); *Rahimi*, 602 U.S. at 690-95 (analyzing laws from 1783 to 1800); *Bruen*, 597 U.S. at 37-55 (analyzing laws from 1786 to 1795); *Heller*, 554 U.S. at 601-04 (analyzing state constitutions from 1791 to 1820). It is wholly unnecessary to wade into the Founding- versus Reconstruction-era debate when only the Supreme Court can settle the score for us.[28] Utilizing Founding era evidence alone, Orange can and should prevail. The Founding-era historical record, within the Court's own timeframe, shows that no state punished forgery with death by 1800—much less by 1852.

---

[28] Even if the debate were ours to settle, more circuits have taken the view opposite to the majority's, acknowledging that statutes from *both* 1791 and 1868 are relevant. *See, e.g.*, *Antonyuk v. James*, 120 F.4th 941, 973-74 (2d Cir. 2024) ("While we recognize that evidence nearest to 1791 can differ from that nearest to 1868, such discrepancy does not mean that the right to keep and bear arms was calcified in either 1791 or 1868. Rather, 1791 and 1868 are both fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation."); *Range*, 69 F.4th at 112 (Ambro, J., concurring) (noting that if the relevant period extends beyond the Founding era, "then Founding-era regulations remain instructive unless *contradicted* by something specific in the Reconstruction-era" (emphasis added)); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and* Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted." (emphasis added)); *Kipke v. Moore*, 165 F.4th 194, 207 (4th Cir. 2026) ("[W]e look beyond the Founding Era to determine whether our national tradition of firearm regulation supports a government's restriction today."); *Ezell v. City of Chicago*, 651 F.3d 684, 705-06 (7th Cir. 2011) (explaining that a "wider historical lens" is required for local and state regulations, then considering evidence from *both* the Founding and Reconstruction).

### 7. *Modern Disarmament*

The majority highlights that plenty of "felon-in-possession" laws were enacted in the twentieth century, first in 1938 and later in 1961. Insofar as these well-past-ratification statutes could be considered relevant, it is worth mentioning that the 1938 crime bill specifically differentiated between "persons convicted of *crimes of violence*" and those convicted of nonviolent crimes like forgery.[29] It was not until the 1961 crime bill was passed that nonviolent crimes were encompassed into the felon-in-possession regulation. *See* 18 U.S.C. § 921(a)(20) (2006); C. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L. J. 1371, 1374-79 (2009) (concluding that "prohibitions on the possession of firearms by felons and the mentally ill" have their origins in the 20th century). And even the 1961 law exempted some business-related crimes. *See* 18 U.S.C. § 921(a)(20) (2006). Whether twentieth century law supports the history and tradition analysis seems to be a question the Supreme Court has answered in the negative—but even the twentieth century legal tradition is *distinguishable* from the present question concerning Orange.

### 8. *Lesser Included Punishments*

With no laws disarming individuals convicted of forgery to point to, the majority is forced to rely on a so-called lesser-included punishment theory—that if a person convicted of forgery could be put to death for their crimes, then surely the Founders would take no issue with

---

[29] A 1922 report from the American Bar Association's Committee on Law Enforcement differentiated between "crimes of violence against the person and property," like murder, burglary, and robbery, which "will seldom be attempted unless the criminal is armed," and "crimes which indicate the dishonesty of the people" like "larceny, extortion, counterfeiting, forgery, fraud, and other crimes of swindling." *For a Better Enforcement of the Law*, 8 A.B.A. J. 588, 590 (1922).

disarming them.[30]  As a result, the majority opinion neglects to properly weigh Orange's

conviction under the dangerousness test set forward in *Rahimi*.

In applying the history and tradition test, the majority gives the Commonwealth a

decisive assist; most of the historical laws cited were supplied by this court.  The majority's is an

odd approach to holding the government to its burden of justifying a prohibition on one's

exercise of an individually held constitutional right.  *See Bruen*, 597 U.S. at 25, 34 ("*Only if [the*

*Government can] carry that burden* can [it] show that the pre-existing right codified in the

Second Amendment, and made applicable to the States through the Fourteenth, does not protect

petitioners' proposed course of conduct." (emphasis added)); *Hemani*, 225 L. Ed. 2d at 324-25

("We decide cases 'based on the historical record' and arguments '*compiled by the parties'*

*before us*." (quoting *Bruen*, 597 U.S. at 26 n.6)).

Many of the laws that my colleagues have plucked from obscurity are legally distinct

from the Class 5 forgery law, codified at Code § 18.2-172, for which Orange was convicted.

And even to the extent that the majority scrapes together a paltry collection of (arguably)

---

[30] Fundamentally, our analysis should be focused on our nation's tradition of *firearm regulations*, not broadly on its historical *punishments* of those convicted of crime.  The Supreme Court, in *Bruen*, made a clear judgment that Founding-era views on firearms are to be considered as part of our country's tradition; but the justices have not made similar judgments for punishments under the Eighth Amendment.  This distinction suggests that Founding-era punishments may simply reflect outdated, even barbarous moral judgments, that have, needfully, advanced.  Importantly, the Court has never suggested that a history-based test should apply in interpreting the "cruel and unusual" clause of the Eighth Amendment.  *See, e.g.*, *Miller v. Alabama*, 567 U.S. 460 (2012).

The greater-includes-the-lesser argument is the only one that the majority can utilize in the case before us because historical firearm regulations—in earnest the only relevant regulations lower courts should turn to—enveloped only *dangerous* individuals, which Orange is not (at the Commonwealth's own concession).  *See* Oral Arg. 24:25-26:30.

The Commonwealth also expressed wariness during oral argument of a lesser-included-punishment theory, noting that the theory could be used to "wipe away any number of rights in the Bill of Rights."  *See* Oral Arg. at 17:06-27.  Instead, the Commonwealth suggested that this Court focus on the loss of property as punishment for crime, and whether firearms were taken as part of that punishment.  *See* Oral Arg. at 18:15-18:40.

relevant capital punishment laws, they are a far cry from the "history and tradition" that the Commonwealth bears the burden of proving. The modern forgery statute Orange was convicted under covers both forgery and fraudulent inducement of a signature from someone else. Under *Bruen*, the Commonwealth bore the burden to prove that there was a historical analogue to disarm Orange. In looking at the statutes the majority uses as historical analogues, they all cover traditional forgery, i.e., the defendant signing someone else's name. The Commonwealth bears the burden to prove the details of Orange's forgery to be able to rely on these analogues to establish the right to disarm her. If, for instance, her forgery was for tricking a third party into signing a document, the historic forgery statutes would not apply, and the relevant analogue would instead be statutes covering fraud at the time.

Article 1 of Chapter 6 of the Virginia Code contains our Commonwealth's four felony forgery statutes, each differentiated by the types of *writings* that a defendant has forged. *See* Code §§ 18.2-168 through -173.[31] Three statutes cover various forms of *public* forgery: Code § 18.2-168 covers every "public record, or certificate, return, or attestation. . . ." Code § 18.2-169 covers forgeries of the seal of the Commonwealth, court, public office, body politic, or corporation in Virginia. Code § 18.2-170 covers each active "coin, note or bill" of both the Commonwealth and any banking institutions therein. These three public forgeries are all Class 4 felonies, *see* Code §§ 18.2-168 to -170, punishable by not less than two years and not more than ten years in prison. *See* Code § 18.2-10(d).

---

[31] The remaining forgery statutes in Article 1, Chapter 6 relating to forgery, Code §§ 18.2-172.1 and -172.2, are misdemeanor forgery statutes. Code § 18.2-171 and Code § 18.2-173 are felony statutes that relate to the usage of particular tools used to perpetuate, or in the furtherance of, the four different kinds of forgeries.

Orange, on the other hand, was convicted of a Class 5 forgery under Code § 18.2-172.[32]

Code § 18.2-172 has been explicitly recognized by the Virigina Supreme Court *and this Court* as a *private* forgery.[33] *See Campbell v. Commonwealth*, 13 Va. App. 33, 38 (1993) ("It is readily apparent that violation of *any* of the forgery statutes *other than Code § 18.2-172* is an offense against the public in general or, as in this case, the government itself." (emphasis added)); *Gibson v. Commonwealth*, No. 0130-95-3, slip op. at 2, 1996 Va. App. LEXIS 296, at *2 (Apr. 23, 1996) (referring to Code § 18.2-172 as "the private record statute"); Oral Arg. at 23:58 (the Commonwealth conceding that Orange's forgery "wasn't forgery of a public record").

The distinction between public and private documents is crucial, as the General Assembly has decided to classify the forgery of public documents as a Class 4 felony and forgery of private documents as a Class 5 felony. Class 4 felonies allow for a sentencing judge to impose up to a $100,000 fine for which Class 5 felonies do not allow, as well as an additional one year in prison for which Class 5 felonies do not allow. *Compare* Code § 18.2-10(d), *with* Code § 18.2-10(e). And with a Class 5 felony, the jury can use its discretion to override the mandatory minimum, instead sentencing the defendant to up to twelve months in jail and/*or* a $2,500 fine. *See* Code § 18.2-10(e). Clearly, this disparity in sentencing shows that the General

---

[32] Here, it is undisputed that Orange's conviction for forgery was a nonviolent crime. *See* Code § 17.1-805(C) (delineating all violent crimes in Virginia, among which forgery is not listed); 18 U.S.C.A. § 924(e) (classifying violent felonies as those crimes involving use or threat of physical force).

[33] Such private documents include time sheets, hospital discharge forms, falsified doctor's notes, and patients' medical charts. *See, e.g.*, *Barr v. Commonwealth,* No. 1150-01-3, slip op. 3-5, 2002 Va. App. LEXIS 218, at *4-6 (Apr. 9, 2002) (time sheets); *Pullin v. Commonwealth*, No. 2758-07-2, slip op. at 1-2, 2009 Va. App. LEXIS 139, at *2 (Mar. 24, 2009) (hospital discharge form); *Lee v. Commonwealth*, No. 1271-09-4, slip op. at 2-3, 2010 Va. App. LEXIS 181, at *3 (May 4, 2010) (falsified doctor's notes); *Beshah v.* Commonwealth, 60 Va. App. 161 (2012) (medical chart).

Assembly treats forgery of public and private documents as separate and distinct. The difference of $97,5000, or between prison versus jail, should not be dismissed.

Ignoring this public-private distinction, the majority cites numerous public record forgeries, which carried the death penalty, and next to zero private record forgeries, which did not carry the death penalty. I will now discuss each in turn.

### a. Death Penalty for Forgery Before Ratification

The majority next points to a handful of English common law rules that implemented the death penalty for forgery of public documents—each a lackluster analogue for Orange's Class 5 forgery conviction.[34] First, the majority cites a 1711 law[35] for forgery of the South Sea Company's stock. This law is better analogized to Code § 18.2-169, which covers forgeries of the seal of any corporation in Virginia. Code § 18.2-169 is also the most appropriate historical analogue for the 1722 law[36] cited by the majority, that criminalized forgery of annuities, stocks, or dividends. And the 1729 law[37] outlawing forgery of promissory notes and financial instruments is analogous, with some surprising specificity, to Code § 18.2-170, which regulates the forgery of "any note or bill of a banking company."

The majority next points to a handful of colonial Virginia's laws against forgery of public documents that are, at most, analogous to the Class 4 forgeries—not to Orange's Class 5 forgery

---

[34] I will not rehash the critiques of the *Bruen* Court, discussed above, wherein the Justices expressed some wariness about pre-1776 laws under the British command. I will simply reiterate my own suspicion, given our country's nascency and the budding revolt against that Crown—especially considering that our revolution was based in large part on the oppressive nature of English law. We must look to the *principles* underlying the history and tradition of our nation during that time period, not those of the government from which we declared independence.

[35] *See* 8 Geo. I ch. 22, § 1 (1711) (Eng.).

[36] *See* 9 Geo. I ch. 12, § 4 (1722) (Eng.).

[37] 2 Geo. II ch. 25, § 1 (1729) (Eng.).

conviction. *See* 1777 Va. Acts 63 (ch. 2, § 18) (certificates of money for war debts); 1777 Va. Acts 51 (ch. 5, § 4) (certificates of money borrowed from the Commonwealth), § 9 (loan certificates and treasury notes); 1777 Va. Acts 55 (ch. 11, § 1) (certain government warrants and drafts); 1783 Va. Acts 198 (ch. 10, § 38) (forgery of a certificate of a justice of the peace concerning tobacco receipt).

The 1777 act provided: "if any person within this commonwealth shall forge or counterfeit, alter or erase, any certificate of money . . ., every person so offending, and being lawfully convicted, shall forfeit his whole estate, real and personal, . . . and shall be obliged to serve on board some armed vessel . . . without wages, not exceeding seven years." 1777 Va. Acts 51 (ch. 5, §§ 4, 9). The sections of the act criminalizing the forgery of a certificate of money and loan certificate would likely fall under Code § 18.2-170, as a forgery of a "coin, note, or bill" or certificate by a banking institution. The section criminalizing the forgery of government warrants would likely fall under Code § 18.2-168's forgery of public records. Orange's Class 5 felony conviction for forgery of a private document is a less serious felony than the 1777 act—and *still the death penalty was not attached* to those Class 4 forgery analogues.

The only death penalty imposition in 1777 for a forgery crime came from the General Assembly's May session: the forgery of certificates of federal money. *See* 1777 Va. Acts 50 (May Session, ch. 4, § 5). Forgery of a certificate of money would likely be Class 4 felonies under Code § 18.2-170, as a forgery of a "coin, note, or bill" or certificate by a banking institution. It should not, then, serve as a historical analogue to Code § 18.2-172.[38]

---

[38] There were also a handful of pre-1789 Acts that the majority did not cite, but I will mention for the sake of executing an exhaustive historical survey. Virginia punished with death: the forgery of currency of the continental congress (directly comparable to Code § 18.2-170), *see* 1776 Va. Acts 38 (ch. 10); the forgery of the public seal (directly comparable to Code § 18.2-169), *see* 1779 Va. Acts 98 (ch. 13); forgery of treasury notes and warrants signed by the governor, state auditor, and other enumerated government or military officials (comparable to Code § 18.2-168), *see* 1779 Va. Acts 102-03 (ch. 24), 1783 Va. Acts 188 (ch. 8, § 14); forgery of

b.  Death Penalty for Forgery Under Virginia's 1789 Act[39]

I turn now, as the majority does, to a Founding-era Virginia law that specifically provided the death penalty for forgery of *public* documents.  The majority highlighted several public-documents statutes that imposed the death penalty, but my colleagues failed to identify one important historical analogue within this act.  For *private* letters, *in the very same statute*, the General Assembly punished those who

> falsely and deceitfully obtain or get into his or their hands or possession, any money, goods or chattels of any other person or persons, by colour and means of any such false token, or counterfeit letter, made in any other man's name as is aforesaid; every such person and persons so offending . . . shall have and suffer such correction and punishment, by imprisonment . . . not exceeding one year, and setting upon the pillory . . . .

1789 Va. Acts 11.  This appears to be the only Virginia statute that is truly analogous to the forgery of private documents under Code § 18.2-172.[40]

---

the stamp of the state inspector of flour (comparable to Code § 18.2-169), *see* 1782 Va. Acts 170 (ch. 52, § 6); forgery of the stamp of the state inspector of tobacco (comparable to Code § 18.2-169), *see* 1783 Va. Acts 198 (ch. 10, § 35); forgery of certificates of money (directly comparable to Code § 18.2-170), *see* 1784 Va. Acts 19 (ch. 69, § 1).  But the same rule applies.  None of these death-penalty-imposing statutes are analogous to Orange's Class 5 forgery of a private document.

[39] While we consider the entire history of the nation, the Second Amendment is only applicable to the states by way of its incorporation in the Fourteenth Amendment.  That Virginia chose to ratify the Bill of Rights necessitates the import of the history of Virginia law.  This is especially true because, at the Founding, felonies were treated differently state by state.  According to James Madison, "felony" was "a term of loose signification even in the common law of England, but more so in the States where [t]he meaning of the term . . . [was] not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws."  The Federalist No. 42, at 228 (J. R. Pole ed., 2005).

[40] This statute shows, as Hening acknowledges, that Virginia's Founders recognized the traditional common law rule that lesser "forgeries" were either not classified as forgeries at all or were misdemeanors.  *See* William Heller Hening, The New Virginia Justice 510 (1795) ("As for writings of an inferior nature as *private letters*, and such like, the counterfeiting of them is not properly forgery, therefore in some cases, it may be more safe to prosecute such offenders for a *misdemeanor as cheats*." (emphasis added)); *White v. United States*, 300 Va. 269, 274 n. 2 (2021) (referring to Hening as "one of Virginia's leading legal scholars after the revolution" and

Even assuming that Orange's forgery of private documents could have somehow fallen under the 1789 Act regulating public forgeries, the majority concedes that the Virginia state legislators repealed the death penalty for forgery in 1796. *See* 1796 Va. Acts 4 (ch. 2, § 9). And yet, the majority failed to factor the repeal into its analysis. By hanging their hat on the lapse of five years after the Founding, my colleagues unnecessarily limit the history and tradition test beyond what the Supreme Court mandated. *See Bruen*, 597 U.S. at 20 (noting an "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification' was 'a critical tool of constitutional interpretation'"). Courts must reject "rigid" or forced approaches to historic analogues. *See Rahimi*, 602 U.S. at 703-04 (Sotomayor, J., concurring) (noting courts applying *Bruen* should "conside[r] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" (alteration in original)); *id.* at 705 (Sotomayor, J., concurring) ("*Bruen* was 'not meant to suggest a law trapped in amber.'").

In fact, the *Bruen* Court took history beyond the Founding era, considering gun regulations that spanned the 19th century. *See* 597 U.S. at 50-70. The *Bruen* majority even cited two surety laws from 1795 and 1801 to support its history and tradition analysis. *Id.* at 49-50. *Rahimi* built onto this history and tradition test by relying on that same 1795 surety law, as well as the development of surety laws from "the 1700s and early 1800s." 602 U.S. at 681. The *Heller* Court's analysis of the Founding era included history from "the 18th century or the first two decades of the 19th." 554 U.S. at 584, 602. The *Heller* Court then considered pre- and post-

---

noting the importance that Thomas Jefferson placed in Hening's "New Virginia Justice," as well as the work's contemporaneous public significance); *Powell v. Commonwealth*, 52 Va. 822, 825 (1854) (noting the distinction between public and private forgery was made for the purpose of "discriminating between those writings which might affect the rights of others whereof forgery might be committed, and other writings by which, whether false or genuine, the pecuniary interests of others could not be affected," such that an element of fraud must also be proven).

Civil War laws as a secondary but "instructive" consideration. *Id.* at 614, 609-19. A law was in place in 1791; the General Assembly repealed that law in 1796. A five-year period between mid-1791 and 1796 does not "a Nation's history and tradition" make. A faithful application of the *Bruen* test does not miss the forest for the trees.[41]

Further, if we must consider the repealed 1789 law, it is *still* distinguishable from forgery of private documents, for which Orange was convicted. *Compare* 1789 Va. Acts 13 (ch. 19), *with* Code § 18.2-172. The majority asserts that, because it punished forgery of deeds and wills with death, the 1789 law regulated private documents enough for it to be a historical analogue to Code § 18.2-172. However, deeds, wills, and money orders have long been considered public records in Virginia. *See Campbell*, 246 Va. at 181-82 (noting "any will, testament or codicil; any deed, bond, writing or note [concerning property]" in a long list of public records applicable under Code § 18.2-168 (citing Code ch. 154, § 4 (1819))).[42] The *Campbell* Court examined

---

[41] By 1796, Virginia did not even put to death those who forged coins, bills, or other money of the bank of the United States. The General Assembly's decision to lessen the punishment of these forgery statutes is significant, especially the statute regulating coins, moneys, and bills, as the forgery of these documents was seemingly the most severely punished forgery crime across the nation. *See* 1796 Va. Acts 5 (ch. 2, § 9). The trend in the 1790s to remove the death penalty displays a trend in public discourse surrounding the death penalty for forgery crimes at large, though no state ever imposed the death penalty for private documents.

[42] The majority asserts that *Campbell* makes no such public-private distinction. But it does. In *Campbell*, the Virginia Supreme Court analyzed the 1819 codification of the forgery statutes we have in place now. In 1819, the statute enumerated a list of *public* records and then, after significant historical analysis, differentiated those public records from "other writing[s], [forged] to the prejudice of another's right." 246 Va. at 182. The Court found that "the descriptive phrase 'to the prejudice of another's right' appears only in relation to 'other writings.'" *Id.* As a result, the Court wrote, "We think that the purpose of the 1819 Act was to codify the English common law and to *preserve its distinctions between forgery of public records and forgery of private documents*. In our view, the language 'to the prejudice of another's right' modifies only writings other than those specifically listed by name." *Id.* (emphasis added). As a result, "harm or prejudice to the right of another person has never been and is not now an element of the crime of forgery of public records in this Commonwealth." *Id.* at 184. The writings listed as public records included deeds and wills expressly. *Id.* While I agree with my colleagues that the discussion of prejudice, the main issue in *Campbell*, is

English common law and Virginia historical statutes, in interpreting the 1819 law, and expressly

rejected the majority's current argument that wills and deeds are private documents in the

context of forgery.[43]  All in all, a survey of the historical statutes clearly indicates that Virginia's

Founders would not have imposed the death penalty for forgery of *private* documents.

c. Death Penalty for Forgery Under Virginia's 1792 Act

The majority next incorrectly claims that the "General Assembly enacted a law

condemning anyone who forged a tobacco certificate to 'suffer death.'"  1792 Va. Acts ch. 18,

§ 41.[44]  However, under Section 41 of the cited statute, a person who forged such a certificate

was to "suffer as in case of willful and corrupt perjury."[45]  *Id.*  *See also* 1792 Va. Acts 76,

https://heinonline.org/HOL/P?h=hein.ssl/ssva0180&i=64.  The "perjury" language under Section

41 is different from the punishment for stealing tobacco in Section 40, immediately preceding

---

irrelevant to our holding, the *Campbell* Court's understanding of the history, as well as the
acknowledgment of the public-private distinction, directly informs today's inquiry.

[43] Although the majority is interpreting a statute from 1819, which is on the outer bounds
of the "Founding era," the Virginia Supreme Court's analysis is still informative to—if not
binding on—our decision today, as the 1819 statute became Virginia's current Code § 18.2-168.
Not to mention the fact that historical discussion therein shows important trends in Virginia's
history and tradition.  *See Adams v. Cowan*, 160 Va. 1, 9 (1933) ("It is said that this was a
*dictum*.  Grant that it is so; it was the *dictum* of a distinguished judge, concurred in by the entire
court, and is entitled to much respect." (citing *Kent v. Kent*, 106 Va. 199, 203 (1906))).

[44] The majority did not, but for the sake of completeness, I will note that the 1792
General Assembly also put to death anyone who forged the notes and checks of a certain bank.
1792 Va. Acts 107 (ch. 78, § 22).  This statute is clearly a better analogue to Code § 18.2-170,
for forgery of banking notes, than it is for forgery of private documents.

[45] The punishment for perjury, at the Founding and under the common law, was not
death.  Perjury in Virginia during this time period was "adjudged to pay a fine not exceeding one
hundred pounds, and to suffer imprisonment by the space of six months," as well as the inability
to serve on a jury or testify in court.  *See* 1789 Va. Acts 16.  Even the English abolished the
death penalty for perjury in 1563.  *See* 5 Eliz., c. 9; Charles Viner, *General Abridgment of Law
and Equity, Alphabetically Digested under Proper Titles; with Notes and References to the
Whole*, 309 (2d ed. 1791-1795) (describing the punishment of death for perjury in the medieval
times to corporeal punishment in the 1400s and 1500s to a "fine and ransom, and never to bear
testimony" after 1563).

Section 41. Section 40 required anyone "convicted by due course of law" to "be adjudged a felon" and to "suffer death as in case of felony, without benefit of clergy." *Id.* That these two statutes are in the same chapter, one after another, and have different penalties implies that the General Assembly did not want for those convicted of forgery to be put to death. *See Bragg Hill Corp. v. City of Fredericksburg*, 297 Va. 566, 584 (2019) (noting courts "presume that every part of a statute has some effect, and [] will not consider any portion meaningless unless absolutely necessary" (alteration in original) (quoting *Logan v. City Council*, 275 Va. 483, 493, 659 (2008))).

#### d. Death Penalty for Horse Stealing Under 1794 Act

Lastly, the majority makes a comparison to Virginia's punishment of horse theft, which the Fifth Circuit in *Diaz* found to be the "closest colonial-era analogue to *vehicle theft*." *United States v. Diaz*, 116 F.4th 458, 468 (5th Cir. 2024) (emphasis added) (deciding whether theft of a vehicle was a dangerous crime for which the defendant could be disarmed). However, the history of horse theft is well beyond the scope of our inquiry of forgery of private documents. *See Range v. Att'y Gen. U.S. of Am.*, 124 F.4th 218, 231 (3d Cir. 2024) (noting that the inquiry into whether "the Founding-era practice of punishing some nonviolent crimes with death" is analogous to "the *particular (and distinct) punishment* at issue here . . ." (emphasis added)); *United States v. Williams*, 113 F.4th 637, 660 (6th Cir. 2024) ("The dangerousness determination will be fact-specific, depending on the unique circumstances of the individual defendant.").[46]

---

[46] The majority believes all forgery laws are to be treated equally, citing to the "historic twin" language from *Rahimi*. 602 U.S. at 701. While this is obviously a helpful rule for ambiguous statutes, or those contemporary statutes that might not have been anticipated by the Founders, when a law regulating a particular crime *was existing* in the Founding era *almost exactly as it is today*, criminalizing the same conduct, surely there is a need to honor the Founding traditions surrounding that conduct.

In *Rahimi*, the court compared historic "going armed" disarmament laws to the contemporary "going armed" disarmament law in Texas. The regulation was the same, criminalizing the *same gun-related conduct*. *Rahimi*, 602 U.S. at 697-99. In the historical law

Additionally, under Code § 17.1-805(C), robbery, breaking and entering, and some trespass crimes are all classified as violent crimes, while paper crimes like forgery are classified as nonviolent crimes. While historical analogues need not be "twins," they must be "analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30.

### e. Death Penalty for Forgery in Other States

Though it cited a great many Founding era statutes, the majority has failed to find a historical analogue justifying the disarmament of Orange. In 1791, the United States was comprised of thirteen states. Only two of these states arguably allowed for the execution of a person convicted of forgery of documents not directly related to the government—and the available evidence indicates that none of them actually carried out an execution *because* the defendants committed a forgery of a *private* document. The majority claims, citing *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019), that "death was 'the standard penalty for all serious crimes' at the time of the founding." But, as detailed below, forgery for private documents was not considered a "serious" crime. The practice of the Founding generation, as well as the statutes regulating forgery, do not support the majority's broad contention.

---

cited, violent individuals using guns to terrorize others were disarmed; this is an exact analogue to the criminal behavior for which Mr. Rahimi was convicted: threatening at gunpoint his intimate partner and being involved in five different shootings. *Id.* at 687. The Court then noted, "the penalty—another relevant aspect of the burden—*also fits* within the regulatory tradition. The going armed laws provided for imprisonment, and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* at 682 (emphasis added).

Though the majority, in the present case, seems to have read *Rahimi* as "blessing disarmament as a lesser punishment *generally*, the [*Rahimi*] Court did not do that. Instead, it authorized temporary disarmament as a sufficient analogue to historic temporary imprisonment *only* to 'respond to the use of guns to threaten the physical safety of others.'" *Range*, 124 F.4th at 231 (emphasis added) (quoting *Rahimi*, 602 U.S. at 699). Orange was convicted of forgery of a private document; this kind of conduct existed in the Founding era, and many states regulated it. Therefore, we must look to lesser-included-punishments of *forgery of private documents* only.

The majority first cites a 1792 forgery law from Georgia that punishes forgeries of a long list of public documents and monies—all of which are encompassed in Code § 18.2-168 (public record, certificate, return, or attestation), Code § 18.2-169 (seal of the Commonwealth, court, public office, body politic, or corporation), and Code § 18.2-170 (coin, note, bill, or bank note).[47] Under this statute, like Virginia, Georgia also authorized the death penalty for those guilty of forgeries of "any deed, will, testament bond, writing obligatory, bill of exchange, promissory note, or order for money or goods." *See* 1792 Ga. Acts 35. The majority claims that the promissory note, deeds, and will documents could be classified as private documents under Code § 18.2-172. However, a promissory note, as a promise-to-pay between a debtor and the bank, is analogous to Code § 18.2-170 (coin, note, bill, or bank note).[48] And as discussed above, deeds and wills have long been considered public records in Virginia. *See Campbell*, 246 Va. at 181-82 (citing Code ch. 154, § 4 (1819)).[49] All in all, because of *Campbell*, it is, in the

_____

[47] For the sake of completeness, although the majority does not cite it, I will note that in a 1773 Georgia statute, the death penalty was imposed for counterfeiting paper money and for bills of credit. Robert Watkins & George Watkins*, Digest of the Laws of the State of Georgia from Its First Establishment as a British Province down to the Year 1798, Inclusive, and the Principal Acts of 1799* (1800), at 181, 341. This, of course, would today be regulated under Code § 18.2-170, Virginia's public record forgery statute regarding currency, and would not operate as a strong historical analogue to forgery of a private document.

[48] The majority claims that *Powell*, 52 Va. at 829, controls our inquiry, as the Virginia Supreme Court decided that the forgery of a promissory note between two private parties fell under the predecessor of Code § 18.2-172. However, nothing in *Powell* changes our analysis. The defendant there was convicted of signing a false name on the back of a promissory note between him and a private party that sold him a bill of goods. This kind of private promise-to-pay is distinguishable from the historical laws cited by the majority that put to death those convicted of forging promissory notes to which the United States is a party (given its jurisdiction over the national bank). These laws are more analogous to Code § 18.2-170 (coin, note, bill, or bank note), as discussed throughout this dissent.
    Also, while the Court affirmed the conviction under Code 18.2-168's predecessor statute, it does not appear to have discussed any argument related to whether promissory notes were appropriately classified under that statute.

[49] Again, *Campbell* differentiated those public records, including deeds and wills, from "other writing[s], [forged] to the prejudice of another's right." 246 Va. at 182. The Court wrote,

majority's best case, unclear whether that Georgia act could be considered a historical analogue for forgery of *private* documents. But for the sake of argument, we will assume the majority is correct that it could be.

The majority fails to note that the Georgia Founders did not impose the death penalty for a forgery actually analogous to Code § 18.2-169. Georgia punished the "alter[ation] or eras[ure] [of] the stamp or receipt of any [tobacco] inspector" with "six months imprisonment," a stint in the pillory, and "a fine of one hundred pounds." 1791 Ga. Acts 25-26. And it punished the forgery of a receipt for a claim to entitlement to tobacco shipment "as in a case of wilful[l] and corrupt perjury or forgery." *Id.* In Georgia, the punishment for perjury was "such pains and penalties as are inflicted by the laws of England in cases of this nature." 1760 Ga. Acts 83 (§ 15).[50]

Moving on to the next attempt by the majority to show a history and tradition of capital punishment for forgery of private documents: Maryland. A 1778 law, passed thirteen years before ratification, punished with death only the forgeries of certain certificates issued by the

---

"We think that the purpose of the 1819 Act was to codify the English common law and to *preserve its distinctions between forgery of public records and forgery of private documents*." *Id.* (emphasis added). As a result, as acknowledged by the majority, "harm or prejudice to the right of another person has never been and is not now an element of the crime of forgery of public records in this Commonwealth." *Id.* at 184.

[50] The English abolished the death penalty for perjury in 1563, distancing its judicial courts from disfavored ecclesiastical courts. *See* 5 Eliz., c. 9. *See* Michael D. Gordon, *The Perjury Statute of 1563: A Case History of Confusion*, 124 Proceedings of the American Philosophical Society 438, 439, 450 (1980) ("Perjury was to be punished by a 'fine' of £10; this was the penalty for subornation in 32 Henry VIII c. 9, which was increased by 5 Elizabeth c. 9. In addition, the offender, as in the Perjury Statute, was to be publicly displayed as a perjurer, he would not be allowed to give testimony in any subsequent proceedings, and he would have to give satisfaction to whomever his perjury had injured."); Charles Viner, *General Abridgment of Law and Equity, Alphabetically Digested under Proper Titles; with Notes and References to the Whole*, 309 (2d ed. 1791-1795) (describing the punishment of death for perjury in the medieval times to corporeal punishment in the 1400s and 1500s to a "fine and ransom, and never to bear testimony" after 1563).

treasurer (i.e., bills of credit). *See* 1778 Md. Acts 17 (ch. 17). As such, the best historical analogue would likely be within Code § 18.2-170 (forgeries of coin, note, bill, or certificate of a banking institution) or Code § 18.2-169 (forgery of the seal of a corporation). This statute is one of five types of forgeries that Maryland elected to punish with death in laws passed between 1776 and 1780. The other four statutes criminalized forgeries of: (1) government-issued "bills of credit" (i.e., currency); (2) "certificates, bills or notes of the continental loan office"; (3) U.S. lottery tickets; and (4) bills of credit. Herty & Maryland, *Digest of the Laws of Maryland, Being an Abridgment, Alphabetically Arranged, of All the Public Acts of Assembly Now in Force, and of General Use* (1799), at 255-56. All five of these forgeries are analogous to Code § 18.2-168 (currency), Code § 18.2-169 (public records), or Code § 18.2-170 (seal of the government or corporation). The majority failed to identify a Maryland statute punishing with death the forgery of a private document.

Further, after trending away from the death penalty for several years, by 1790, Maryland appears to have entered a period in which even public forgeries were not punished with death. *See* 1790 Md. Laws (ch. 5) (punishing the forgery and counterfeiting of bank notes with a punishment chosen by a court "so as the same do not extend to death, or more than seven years servitude"); 1799 Md. Acts (ch. 75) (punishing forgery of numerous documents including "any deed, will, testament, bond, writing obligatory, bill of exchange, promissory note for payment of money, or delivery of goods . . . or other valuable articles" with "such punishment as shall be adjudged by said court, s*o as the same do not extend to death*, or more than seven years servitude" (emphasis added)).[51]

---

[51] *See also* 1784 Md. Laws (ch. 79) (punishing the forgery or counterfeiting of "any register, clearance, certificate or permit, granted by any naval officer" with a fine "not exceeding five hundred pounds current money," imprisonment "not exceeding twelve months," or the infliction of "corporal punishment not exceeding thirty-nine lashes"); 1789 Md. Laws (ch. 266) (punishing the "forg[ery] or counterfeit[ing]" of any "manifest or note of any inspector" under

The majority next cites the 1791 forgery laws of New Hampshire. In New Hampshire, the state punished forgery of certain *public securities* with death, analogous to the forgery of bank notes under Code § 18.2-170, or a corporation's seal under Code § 18.2-169. *See* Act of Feb. 8, 1791, § 13, reprinted in *Laws of the State of New Hampshire* 243, 246 (1792). New Hampshire punished forgery of *all other* documents ("other thing[s] whatever") with a stint in the pillory, imprisonment not exceeding three years, and a fine.[52] *See* Act of Feb. 8, 1791, § 14, reprinted in *Laws of the State of New Hampshire*, *supra*, at 246. No person guilty of the forgery of a private document was subject to death in the New Hampshire statutes herein identified.

The majority then turns to New Jersey. The singular statute cited by the majority was adopted because "the enemies of the United States have adopted the mean and infamous practice of counterfeiting the Bills of Credit emitted and made current by the Honorable Congress for the Purpose of carrying on the present just and unavoidable War with Great Britain." Peter Wilson, *Acts of the General Assembly of the State of New-Jersey* (1784), at 136-37. As a result, a person who counterfeited those bills of credit could be punished with death. *Id.* This statute is also analogous to Code § 18.2-168 (coin, note, bill, or bank note), a Class 4 forgery.

Other New Jersey statutes, not cited by the majority, also imposed the death penalty at the time of the Founding, but only for forgery of *public* documents. A 1776 law mandated capital punishment if an individual "counterfeit[ted] or alter[ed] any of the aforesaid Bills of

_____

the relevant act with being "publicly whipped, not exceeding thirty-nine lashes, or fined in any sum not exceeding one hundred pounds, or shall be sentenced to hard labour for any term not exceeding seven years . . . in the discretion of the . . . court"); 1793 Md. Laws (ch. 35) (punishing the forgery or counterfeiting of certain bank notes or checks with "such punish[ment] as if he or they had been adjudged guilty of stealing, or taking by robbery, goods of the like value with the money due on such bank note or check").

[52] *See also* N.H. General Assembly, June, September and December Sessions p. 393 (punishing the counterfeiting of a certain "seal or stamp" with the "forfeit[ure] and pay[ment] [of] the sum of twenty pounds").

Credit, [and] by this Act made a legal Tender . . . .” Wilson, *supra*, at 2-3.[53] The state passed

similar laws in 1780 and 1781. *See id.* at 129-30, 184. These statutes, criminalizing the forgery

of currency are analogous to Code § 18.2-168 (coin, note, bill, or bank note) or Code § 18.2-170

(seal of the government or corporation)—not to forgery of a private document.[54] Put simply,

*none* of the New Jersey statutes punished with death any historical analogues to Code

§ 18.2-172, the forgery of private documents.

Finally, it bears noting that, by the 1790s, New Jersey, like Maryland, appears to have

turned completely away from the use of the death penalty, *even* for non-analogous, *public*

forgery crimes. *See* Wilson, *supra*, at 239 (punishing forgery of “inventories” of damages

submitted under a statute creating reparations system for people who suffered harm due to the

Revolutionary War with “the same Pains and Penalties are by Law inflicted upon Persons guilty

of willful and corrupt perjury”—not death[55]); 1796 N.J. Acts 92 (classifying the forgery and

counterfeiting of numerous documents including “[any] record, or other authentic matter of a

public nature, charter, letters-patent, deed, lease, writing sealed, will, testament, annuity, bond,

---

[53] This law was supplemented in 1799, but the language of the bill was unchanged. *See* Wilson, *supra*, at 100.

[54] Similarly, a 1777 New Jersey law to “prevent forging the Tickets of the United States Lottery” was “punished with death.” Wilson, *supra*, at 7-8. This statute appears analogous to Code § 18.2-170 (seal of the government or corporation), as forging the lottery would require the forging of an official emblem used to authenticate public documents. Nonetheless, the lottery is certainly not a private document, given the U.S. government operated the lottery in 1777 (and still does, in Virginia, today). A 1779 New Jersey law, criminalizing the forgery of a “certificate” or “warrant” to obtain government benefits supporting injured military men was punished with “Punishments inflicted by Law on common and incorrigible Cheats” and made to pay restitution. Wilson, *supra*, at 86-93. Further, a 1782 New Jersey law criminalized and punished with death anyone guilty of forgery of notes issued by the National Bank, a clear analogue to Code § 18.2-168 (coin, note, bill, or bank note). Wilson, *supra*, at 262. And a 1789 New Jersey law punished forging “any certificate, indent, or other public security of the United States” with death. 1789 N.J. Act. 647.

[55] In 1781, in New Jersey, if a person was guilty of perjury, they were “committed to the [jail].” 1753 N.J. Acts 68-69 (ch. 124, § 8); 1778 N.J. Acts 98 (ch. 38, § 3).

bill, writing obligatory, bankbill or note, check, draught, bill of exchange, promissory note . . . warrant, order, or request for the payment of money" as a "high misdemeanor" punishable by "fine or solitary imprisonment at hard labor" of fewer than "ten years"); 1797 N.J. Acts i-vi (characterizing the counterfeiting or forging of stamps and marks for "vellum, parchment, or paper" as a "high misdemeanor," to be punished by a "fine[] . . . not exceeding one thousand dollars," and a term of imprisonment "not exceeding seven years").

Turning to New York, the majority next cites a statute to which the death penalty attached. However, this statute—as well as all other New York statutes punishing forgery with death—criminalized forgeries of *public* documents. And only one of them had the death penalty attached. *See* 1784-85 N.Y. Acts 168 (ch. 88) (dealing with "public certificates of the United States" and "gold or silver coins," i.e., coins, government notes, bills, or bank notes analogous to Code § 18.2-168).[56] New York also had two forgery statutes criminalizing the forgery of brand marks that were punishable with a fine only. *See* 1784 N.Y. Acts 70 (ch. 35); 1784 N.Y. Acts 666-67 (ch. 40).

By 1795, the evidence shows, New York was reclassifying crimes previously punished with death with non-capital punishments. *See* 1795 N.Y. Acts 594-95 (punishing the forgery or counterfeiting of lottery tickets, formerly punished with death, with "confinement in prison during [one's] natural life"); 1798 N.Y. Acts 252-53 (punishing the forgery of certificates or indorsements related to the recordation of deeds with "imprisonment for life in the State prison there to be kept at hard labor, or in solitude"). Ultimately, the majority points to no forgery statute in New York that put to death those who forged private documents.

---

[56] The following New York statutes, not cited by the majority, also imposed the death penalty for public documents: 1789 N.Y. Acts 114-15 (punishing the forgery of lottery tickets with death); 1794 N.Y. Acts ch. 1 (punishing the forging or counterfeiting of a certain "certificate or endorsement" related to "registering deeds and conveyances relating to military bounty lands" with death).

The majority next cites North Carolina forgery laws. *See* 1777 N.C. Acts ch. 12, § 10. These laws made forgery of tobacco stamps punishable similar to "the cases of willful and corrupt perjury."[57] *See id.* At the Founding, perjury was punishable in North Carolina with a fine of up to 500 pounds, a one-hour stint in the pillory, corporal punishment, and an incapacity to give testimony—not death. *See, e.g.*, 1791 N.C. Acts 9-10. Other North Carolina laws also disallowed death upon the first offense (but *did* impose the death penalty for recidivists). *See* 1779 N.C. Acts 281 (ch. 8, § 3) (punishing, upon first offense, forgery of public bills of credit, lottery tickets, or loan-office certificates with "pillory one hour, and have one ear cut off, and receive thirty-nine lashes," as well as imprisonment (at the judge's discretion) and to "forfeit[58] one half of his or her property to the use of this state"); *id.* (ch. 8, § 4) (punishing those same forgeries with death upon a second offense). A later code provision in this same statute punished those guilty of "printing, writing, engraving or by any other ways or means . . . counterfeiting, any of the bills of credit by this act" by "suffer[ing] the pains and penalties which persons guilty of similar offences are liable to by an act." 1779 N.C. Acts 287 (referring to 1779 N.C. Acts 281). It appears that no first-time offender like Orange would have been sentenced to death for

---

[57] Even if the tobacco laws were punishable by death (they were not), they would be analogous to Code § 18.2-170, regulating the use of the seal of the government or a corporation, since the stamps were an emblem of the government. *See* 1777 N.C. Acts ch. 12, §10. And Orange was not convicted under this code section.

[58] As noted in Subsection (g), *infra*, firearms have been in a special legal category when it comes to forfeiture, with many states (including Virginia) prohibiting privately owned guns from seizure in civil suits and estate sales resulting from crime. *See* Greenlee, *supra*, *Disarming the Dangerous*, 16 Drexel L. Rev. at 71. *See, e.g.*, *The Public Records of the Colony of Connecticut, Prior to the Union With New Haven Colony, May 1665*, at 537 (Trumbull ed., Hartford, Brown & Parsons 1850); 13 *Archives of Maryland*, at 557 (1692 Maryland); *id.* at 280 (1715 Maryland); 1 Stat. 271, § 1 (1792). And even in those few states where guns were forfeited, those convicted of crime were not *permanently disarmed*. Greenlee, *supra*, *Disarming the Dangerous*, 16 Drexel L. Rev. at 71 n. 427 (citing *Range*, 53 F.4th at 283).

forgery of any document and that no death sentence would have been imposed for any private forgery in North Carolina.

The Pennsylvania statute that the majority notes punished by death for counterfeiting the name of a "treasurer or loan-officer" on a bank note. *See* Act of March 21, 1783, reprinted in 11 Statutes at Large of Pennsylvania from 1682 to 1801, at 81, 89 (1906); 1783 Penn. Acts 103-04. A 1785 law extended the penalty for bills of credit, though the majority did not identify it. *See* 1785 Penn. Acts 260-61.[59] For these banking and currency laws, if it was the amount of money represented that was counterfeited, the punishment was not death but "the pillory" or to "have both his or her ears cut off and nailed to the pillory, and be publicly whipped on his or her back with thirty-nine lashes." *Id.* There was also the possibility for a fine. *Id.* As stated above, regulations on counterfeiting bank notes and bills of credit are analogous to Code § 18.2-168 (coins, government notes, bills, or bank notes). The Pennsylvania statutes are, thus, not a historical analogue to Code § 18.2-172, forgery of a private document. Even if they were, in 1793, the Pennsylvania legislature signed into law a new punishment for the forgery of bank notes, gold or silver coins, and other currency. *See* 1793 Penn. Acts 600-01. In doing so, the legislature removed the imposition of the death penalty and substituted it with a prison term of no less than four and no more than fifteen years, as well as a $1,000 fine. *Id.*

Pennsylvania also had many forgery statutes that did not result in the death penalty. For instance, a 1777 law regulating the forgery of a travel certificate, which persons were to carry with them if they visited a foreign nation, carried a fine of fifty pounds and "commit[ment] to jail, until he pays the fine and costs of prosecution." 1777 Penn. Acts 64-65. *Accord* Code § 18.2-168 (forgery of public records). The forgery of a federal lottery ticket, within

---

[59] Nor did my colleagues identify a 1780 law that imposed the death penalty for forgeries of bills of credit. *See* 1780 Penn. Acts 395-96.

- 80 -

Pennsylvania, resulted in a stint in the pillory, a public whipping, and a fine. 1777 Penn. Acts 55-56. *Accord* Code § 18.2-168 (forgery of public records). Any counterfeiting of the "brand marks" on casks of flour was punished with a fine of five pounds for a first offense, plus forfeiting the casks counterfeited. 1781 Penn. Acts 456. *Accord* Code § 18.2-169 (forgery of public seals). For the second offense, there was a fine of ten pounds. For the third offense, the individual would be "committed to jail and sentenced to the pillory" for two hours on a busy "market day." *Id.* That statutes analogous to Class 4 forgeries were not even punished with the death penalty suggests that the Pennsylvania Founders would never have executed a person convicted of a Class 5 forgery.

Next, the majority cites a statute from Rhode Island that criminalized and punished with death the forging or counterfeiting of currency, money, or bills of credit (i.e., loans from the state government). *See* 1780 R.I. Laws 51. This law is an inappropriate analogue for three reasons. For one, the Rhode Island law is directly analogous to Code § 18.2-168 (coins, government notes, bills, or bank notes), not Code § 18.2-172. Secondly, if a person was found guilty of merely forging "the Denomination thereof" on the bills of credit, they would "be sentenced to the Pillory, and have both his or hers Ears cut off, and nailed to the pillory, and be publicly whipped Thirty-nine lashes on his or her naked Back." *Id.* And finally, in 1791, Rhode Island seemed to reverse course, passing a law that noted that anyone convicted of forgery of bank notes or checks would "suffer such Punishment as shall be adjudged by said Court, so as the same do *not* extend to Death, or more than Seven Years Servitude or Imprisonment." 1791 R.I. Acts 16 (emphasis added); 1800 R.I. Acts 18-19.

There is a second Rhode Island statute, to which the majority did not point, that also suggests the Founders in that state would not have imposed the death penalty on Orange—much less disarmed her. Rhode Island did not impose the death penalty for forgeries of documents

relating to private shipping. A 1783 Rhode Island statute punished with the "forfeit[ure] [of] the Sum of One Hundred Pounds, and the Value of the Goods mentioned therein" forgeries of "any Permit, Certificate, Receipt or Bill of Lading" of a delineated list of common imports and exports coming in and out of public ports. 1783 R.I. Acts 50.[60] The ports required boat "masters" to sign the Bill of Lading. 1783 R.I. Acts 45-50. It also required naval officers to sign the certificates. *Id.* Because this 1783 statute regulated the public port with numerous public records, and because Code § 18.2-169 also encompasses forgery of the seal of corporations, this statute is likely among the already-discussed statutes that fail to reach the level of historical analogue to Code § 18.2-172. Nonetheless, it showed that Rhode Island did not impose the death penalty for statutes analogous to Class 4 forgeries, so it is likely that the Rhode Island Founders would not have imposed the death penalty for Class 5 forgeries either.

The majority also cites to a 1783 South Carolina law that punished with death the forgery of "gold or silver coins" and/or the possession of any instruments used to forge that money. 1783 S.C. Laws 17. This statute is directly analogous to Code § 18.2-168 (coins, government notes, bills, or bank notes) and Code § 18.2-171 (possession of any "engrave, stamp, or cast, or . . . any plate, block, press, or other thing, adapted and designed for the forging and false making of any writing"). South Carolina had three other laws that the majority did not cite, each imposing death: (1) a 1776 law "to support the credit and satisfy the creditors of the public," which imposed a death sentence to anyone who forged "currency"; (2) a 1785 law criminalizing the counterfeiting of paper bills and tobacco notes; and (3) a 1786 law criminalizing the

---

[60] Under this act, a man was convicted in 1784 "of passing a counterfeit English shilling" and "sentenced to pay a Fine to the State of Nine Pounds." 1786 R.I. Resolutions 11, https://heinonline.org/HOL/P?h=hein.ssl/ssri0480&i=3. Similarly, in 1791, a man was arrested and imprisoned in the gaol for a crime of forgery. 1791 R.I. Resolutions 22, https://heinonline.org/HOL/P?h=hein.ssl/ssri0508&i=3.

alteration, erasure, or counterfeiting of "Special Indents"[61] used in the commission of the state's

tax collection. *See* 1776 S.C. Laws 283; 1785 S.C. Laws 4, 36.[62] These two statutes are also

analogous to Code § 18.2-168. In sum, none of the South Carolina statutes are a historical

analogue to Orange's forgery of a private document.

The majority next cites to a South Carolina statute that included—within an enumerated

list of *public* documents like bank notes and currency—the forgery of deeds and wills as a crime

punishable by the death penalty. *See* 1801 S.C. Laws 36-38.[63] The majority claims that the

inclusion of deeds and wills provides a historic analogue for Code § 18.2-172. However, this

South Carolina statute presents almost exactly the issue that the Supreme Court of Virginia

tackled in *Campbell*. In 1819, the *Campbell* statute listed multiple public records, including

deeds and wills. 246 Va. at 182. The Court found that the English common law distinguished

between forgery of public records and forgery of private documents. *Id.* It then found that deeds

and wills were public documents, in large part because they were groups with other public

documents without modifiers—as are the words "deeds" and "wills" in the South Carolina law.

---

[61] These special indents were contracts that were signed between taxpayers and the state, agreeing to pay a certain denomination due to South Carolina or be put to death. *See* 1786 S.C. Acts 4; *see also Indent*, *Black's Law Dictionary* 916 (12th ed.) ("An indented certificate of indebtedness issued by the U.S. government or a state government in the late 18th or early 19th century."). This same act was reauthorized for the 1787, 1788, and 1794 tax years. *See* 1787 S.C. Acts 5; 1788 S.C. Acts 2-3; 1794 S.C. Acts 26-27.

[62] This statute was recodified into a different code section in 1789. *See* 1789 S.C. Acts 10.

[63] When analyzing the 1796 repeal of the Virginia statute abolishing the death penalty for forgery crimes, the majority noted that the 1796 General Assembly was not encompassed in the Founding era. But now, it cites an 1801 South Carolina law as a Founding era statute—a law enacted five years after the Virginia repeal and ten years after ratification. The majority cannot have its cake and eat it too. And given the *Bruen* and *Rahimi* analyses, both the 1796 and 1801 are likely to be Founding laws.

*Id.* But, as for the Georgia statute above, I will assume for the sake of argument that the South Carolina law is analogous to Code § 18.2-172.

Lastly, the majority cites a 1776 Delaware statute that criminalized the forgery of certain documents. *See* 1776 Del. Acts 366.[64] For the forging of a signer's name on a bill of credit, the punishment was death. *Id.* For the forging of the denomination on the bill of credit, the punishment was the pillory, cutting off one's ears, a public whipping of 31 lashes, a fine, and restitution payments to the victim. *Id.* If the guilty party could not pay the restitution, they were to be "sold" as an indentured servant for a time period not to exceed seven years. *Id.* The forging of a bill of credit is analogous to Code § 18.2-170, as a form of currency, not to the forgery of private documents under Code § 18.2-172. And importantly, six years later, in 1783, Delaware passed a statute analogous to Code §§ 18.2-169 through -171, criminalizing the forgery of the "Common Seal" of the Bank of North America or any of its bank notes, as well as tendering counterfeited bills, and enforcing a punishment of a public whipping, one hour on the pillory, an ear cut off, and restitution. *See* 1783 Del. Acts 2-3. Meaning that, before 1791, Delaware changed the punishment for public forgery from the death penalty to corporal punishment—and notably, *not* disarmament. And further, the 1783 law is still not analogous to the forgery of private documents, because the focus was on documents related to the Bank of North America.

Though the majority did not cite their forgery statutes, there were two more states in the union at the time of the Founding: Connecticut and Massachusetts. In Connecticut, the 1790 law criminalizing the forgery of public records resulted in a punishment of imprisonment (1) for a period not to exceed three years for the first offense, (2) for a period not to exceed five years for the second offense, and (3) for life for third and subsequent offenses. *See* 1790 Conn. Acts and

---

[64] It appears that this bill was reaffirmed in 1781. *See* 1780-81 Del. Acts 731.

Laws 393.[65]  Under this law, forgery and horse theft were regulated together, under the same code section, and carried the same punishment.  *Id.*  However, there was a 1792 statute outlawing the falsifying or altering of "Packing and Branding of any Calk, Barrel or other Vessel" of provisions after their import inspection.  1792 Conn. Acts and Laws 404.  The wrongdoer would be sentenced to a fine of forty shillings per branding altered, under the provision.  *Id.*  Connecticut seems to have not regulated the forgery of private documents.  *See generally* Conn. Acts and Laws (1776-1800).

There was also a 1796 Connecticut forgery statute somewhat similar to Georgia's, under which a person guilty of the forgery of "any false deed, or other writing as aforesaid . . . shall render and pay to the Party of Parties injured thereby double Damages . . . and shall also be rendered incapable and be disabled to give Evidence or Verdict, in any Court or before any Magistrate or Justice of the Peace."  *See Acts & Laws of the State of Connecticut, in America*, (Hartford: Printed by Hudson and Goodwin, 1796).  Although I believe the public-private distinction from *Campbell*, 246 Va. at 184, applies—and that deeds and trusts are to be considered public records, as discussed above—this Connecticut statute is the closest thing the majority has to a historical analogue to Code § 18.2-172.  And, importantly, it did not impose the death penalty.  *See Acts & Laws of the State of Connecticut, in America*, *supra*.

---

[65] Connecticut had two forgery laws before the ratification of the Bill of Rights (but after independence was declared) that said a person convicted of forgery of public securities and private notes of credit was to "suffer the same Penalties as Persons convicted of making or uttering counterfeit Bills of public Credit, are by Law subjected to."  1779 Conn. Acts and Laws 513; 1779 Conn. Acts and Laws 510 (similar language).  The exact same language was used again in 1781.  *See* 1781 Conn. Acts and Laws 581.  However, (1) it is not at all clear whether this meant a former statute, a law from the Continental Congress, or the common law; and (2) the same Connecticut legislature that ratified the Second Amendment also passed into law the 1790 statute prescribing imprisonment for forgeries of public documents.  Therefore, the 1790 law appears to be the best representative of the Founding era.

In Massachusetts, there do not appear to have been any Founding forgery laws analogous to Code § 18.2-172 that imposed the death penalty. As early as 1692, anyone who forged a "false Deed, Conveyance, or Writing sealed, or the Will of any Person or Persons in Writing, to the Intent that the Estate of Free-hold or Inheritance, Right, Title, or Interest of any Person or Persons, of, in, or to any Lands, Tenements, or Hereditaments" or "any Obligation, or Bill Obligatory, Letter of Attorney, or any Acquittance, Release, or other Discharge of any Debt, Account, Action, Suit, Demand, or other Thing Personal," was to then be had to pay the aggrieved party "double Costs and Damages," and "also shall be set upon the Pillory in some Market-Town, or other open Place, and there to have One of his Ears cut off, and also shall have and suffer Imprisonment by the Space of One whole Year without Bail or Mainprize." *Acts and Laws Passed by the Great and General Court or Assembly of the Province of the Massachusetts-Bay in New-England* (June 1692), https://heinonline.org/HOL/P?h=hein.ssl/ssma0556&i=1. While the colonial era may not be as informative as the Founding era, as discussed above, the 1692 Massachusetts law was by far the most encompassing of any of the thirteen states in the union, and one of the only ones to encompass private documents like letters from an attorney.

And the 1692 law becomes legally relevant because its principles were continued and extended to other kinds of documents well into the Founding era. *See* 1777 Mass. Acts and Laws 117 (instructing that anyone guilty of forgery of a loan office certificate or lottery ticket shall be "set on the Gallows for the Space of one Hour, with a Rope round his Neck, and shall pay a Fine not exceeding One Hundred Pounds"); 1779 Mass. Acts 243 (similar, but also including a sentence of one year in prison and a public whipping of 39 stripes); 1780 Mass. Acts and Laws 312 (instructing that anyone guilty of forgery of a lottery ticket shall be "set on the Gallows for the Space of one Hour, with a Rope round his Neck, and shall pay a Fine not exceeding Five Hundred Pounds"); 1785 Mass. Acts and Laws 267 (noting the punishment for

forgery of public and banking records was "setting in the pillory, at one or more times or places, cropping one ear, whipping, imprisoning, fining, and binding to the good behaviour"); 1790 Mass. Acts and Laws 52 (detailing that a person guilty of forgery of a lottery ticket must pay a fine not exceeding one hundred pounds, and receive a whipping, be made to stand in the pillory, and/or serve a term of imprisonment); 1796 Mass. Acts and Laws 457 (directing that anyone guilty of forgery of "silver or gold money, or coin" be punished by paying a fine "not exceeding one hundred pounds, be set in the pillory one hour, be whip[ped], not exceeding twenty stripes, have one ear cut off, be bound to the good behaviour or confined to hard labour, not exceeding three years"); 1801 Mass. Acts and Laws 467 (mandating that a person guilty of forgery of bank bills serve no less than three and no more than ten years in prison). *See also Private & Special Statutes of the Commonwealth of Massachusetts from the Year 1780 to the Close of the Session of the General Court, Begun & Held on the Last Wednesday in May, A.D. 1805* (Boston: Printed for the State, by Manning & Loring, 1805). It appears that the tradition of Massachusetts was corporeal punishment for forgery of both public *and private* documents—and notably, disarmament was not a listed consequence.

That *two* of the thirteen states in the union in 1791 (Georgia) and 1801 (South Carolina) *perhaps* had in its code books capital punishment for the forgery of private documents (deeds and wills) does not a history and tradition of the United States make. *See Bruen*, 597 U.S. at 65-66 ("As in *Heller*, we will not 'stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms . . . .'" (alteration in original)).[66] This is

---

[66] In a 2024 en banc review, the Third Circuit decided that a man convicted of federal food stamp fraud could not be disarmed. *See Range*, 124 F.4th at 225-27. In doing so, the Third Circuit highlighted five states with Founding forgery or counterfeiting laws that did not result in capital punishment. *Id.* at 227. The majority in this case critiques the *Range* court for citing an 1803 forgery law in Virginia. My colleagues believe that 1803, twelve years after ratification,

especially true given the fact that the available data shows Georgia did not execute *anyone* for forgery between 1608 and 1800. *See* M. Watt Espy & John Ortiz Smykla, *Executions in the United States, 1608- 2002: The ESPY File* (2004), https://doi.org/10.3886/ICPSR08451.v5. Because the death penalty was not imposed for forgery of private documents in even a *few* of the thirteen states—much less the overwhelming number of them, as the majority contends—the *national* public discourse would not have supported the death penalty as a just punishment for forgery of private documents.

f. Federal Death Penalty for Forgery

The majority asserts that there is a history and tradition of sentencing to death those convicted of forgeries of private records because Congress enacted a 1790 statute imposing the death penalty on anyone who forged or counterfeited a public certificate or public security of the United States. *See* Act of Apr. 30, 1790, ch. 9, § 14, 1 Stat. 112, 115. Similarly to the state laws above, this federal statute is analogous to the forgery of bank notes under Code § 18.2-170, or to the forgery of the United States seal under Code § 18.2-169. As such, it is not a historic analogue to Code § 18.2-172, forgery of private documents.

was too late to be considered as part of the nation's history and tradition—adopting a myopic definition of the Founding era. *Cf. Bruen*, 597 U.S. at 49 (highlighting 1795 and 1801 statutes); *Rahimi*, 602 U.S. at 694-95 (citing an 1800 surety law); *Heller*, 554 U.S. at 603-04 (relying on 1820 statutes). Even if we had to discard any laws not operable in 1791, as the *Range* court identified, numerous states did not utilize capital punishment for forgery at or around 1791. *Id.* ("But at the Founding, many states were moving away from making felonies—including crimes akin to making false statements—punishable by death in America. . . . For example, in Massachusetts, New Jersey, Kentucky, Virginia, Connecticut, and New York, forgery and counterfeiting were punishable with imprisonment, hard labor, fines, or corporal punishment, but not death." (internal citations omitted)). *See also* James T. Mitchell et al., *Compiled Statutes at Large of Pennsylvania from 1682 to 1801* (1700-1809); *An Act to Prevent Forgery, And For the Punishment of Those Who Are Guilty of the Same*, 1784 Mass. Acts ch. 67; Harry Toulmin, *Collection of All the Public and Permanent Acts of the General Assembly of Kentucky Which Are Now in Force* (1802); Acts and Laws of the State of Connecticut (1784); William Paterson, *Laws of the State of New Jersey* (1800); Thomas Greenleaf, *Laws of the State of New York, Comprising the Constitution, and the Acts of the Legislature, since the Revolution, from the First to the Fifteenth Session* (1797).

The majority also cites, rather outlandishly, federal forgery statutes associated with international terrorism. *See* 18 U.S.C. § 1546. This statute is not an analogue to forgery of a private document in the slightest. Terrorism charges are classified as violent crimes. *See* Code § 17.1-805(C). This classification is commonsensical, as terrorism is a serious threat to national security. *See supra* (discussing the founding fathers' imperative to disarm rebels or insurrectionists but not nonviolent individuals). It is hard to imagine how forgery under Code § 18.2-172 could relate to international terrorism. Perhaps one could forge immigration documents (which would be public documents under Code § 18.2-168), documents needed for international travel (like a passport or Real I.D. which would fall under the provisions for public records or seals). And Code § 18.2-172 certainly does not touch the transportation of guns, weaponry, explosives, or any of the other violent crimes listed under Code § 17.1-805(C).

The majority notes that the federal government kept the death penalty for forgery of public documents on the books until 1825. *See Wynne v. United States*, 217 U.S. 234, 241 (1910) (discussing the 1825 act). However, even if the statute was applicable to Orange (which it is not), there were no federal executions for forgery in this time period. *See* Hannah Freedman, *The Modern Federal Death Penalty: A Cruel and Unusual Punishment*, 1689 Cornell L.Rev. 107, 1707 (2022).[67] In sum, in its exhaustive list of forgery statutes at the Founding, the majority

---

[67] Between 1790 and 1829, there were only 138 federal capital trials. Of those, 118 resulted in convictions. Hannah Freedman, *supra*, *The Modern Federal Death Penalty: A Cruel and Unusual Punishment*, 1689 Cornell L. Rev., at 1708. Sixty-four of the 118 condemned men were pardoned; 42 were executed; six went "unaccounted for"; three died in custody; two escaped; and one died by suicide. *Id.* (citing H.R. EXEC. NO. 20-146 (1829), reprinted R in H.R. REP. NO. 53-545, app. at 6 tbl.1). And "the approximately seventy-five federal executions carried out before the Civil War were all imposed for some form of piracy or armed robbery of the United States mail." *Id.* at 1709.

fails to find a historical analogue justifying the disarmament of Orange and cites no *tradition* of executions for forgery of a private document.[68]

### g. Forfeiture of Property

Finally, the majority claims, without citing any case law to support its claim, that "the right to armed self-defense" was "obviously subsumed within the . . . forfeiture of all property, real and personal." But the history of firearm rights does not support this argument, as firearms were not considered as typical "personal property." In fact, the Virginia General Assembly

---

[68] The majority makes the sweeping assertion that seven circuits have allowed the disarming of a person with any felony conviction. However, the reality of the circuit court split is not that simple. What the federal circuits *have* done is differentiate between violent and nonviolent felony convictions—routinely upholding the disarmament of *only* those found to be a physical threat to others. *See Range*, 124 F.4th 218 (overturning felony-in-possession law of an individual convicted of food stamp fraud because, having served his sentence, he was no longer dangerous); *Diaz*, 116 F.4th at 469 (disarming as dangerous an individual previously convicted of two vehicle thefts, while carrying a firearm and narcotics, and evading arrest); *United States v. Daniels*, 124 F.4th 967, 979 (5th Cir. 2025) (affirming an as-applied challenge to a felony-in-possession charge for felony possession of narcotics because "applications of § 922(g)(3) must accord with our nation's history of firearm regulations, and disarming individuals solely for their prior, occasional, or habitual marihuana use does not"); *Williams*, 113 F.4th at 658-61 (categorizing offenses that could lead to disarmament— "crimes against the person" like murder, sexual assault, and even drug trafficking—because they "pose a significant threat of danger," and those that could not lead to disarmament—crimes like mail fraud and making false statements, that pose no such danger); *United States v. Williams*, 616 F.3d 685, 693 (7th Cir.) (finding an individual with a previous conviction of robbery to be dangerous, given he "beat[] the victim so badly that the victim required sixty-five stitches," and thus eligible to be disarmed), *cert. denied*, 562 U.S. 1092 (2010). All of these holdings are in line with the dangerous-nondangerous distinction my dissent hopes to underscore.

Only one federal circuit decided a felon-in-possession case in a way that echoes today's majority. *See United States v. Hunt*, 123 F.4th 697, 705 (4th Cir. 2024). One circuit is a far cry from a circuit split; it merely creates an outlier. The majority also relied on *Kanter*, a pre-*Bruen* case that was overruled in part by the *Bruen* Court, because its seriousness test employed a rational basis review, which is no longer the Second Amendment standard. *See Bruen*, 597 U.S. at 18-19. *See also Kanter*, 919 F. 3d at 451 (disarming an individual guilty of a $27 million mail fraud scheme used to evade Medicare requirements because the defendant was convicted of a "serious" federal felony).

Lastly, as a minor note, the majority also cites *United States v. Vizcaíno-Peguero*, 175 F.4th 34, 47 (1st Cir. 2026), but that case looked to whether an "alien" was one of "the People" under the first prong of the analysis, and did not engage in the dangerousness standard set forth for those with previous felony convictions. Its inclusion seems to be altogether irrelevant.

placed firearms in a *special legal category*, prohibiting privately owned guns from being held subject to seizure in a civil suit or being included in estate sales that resulted from convictions for crimes—including the federal Uniform Militia Act of 1792. *See* Greenlee, *supra*, *Disarming the Dangerous*, 16 Drexel L. Rev. at 71. *See, e.g.*, *The Public Records of the Colony of Connecticut, Prior to the Union With New Haven Colony, May 1665*, at 537 (Trumbull ed., Hartford, Brown & Parsons 1850); 13 *Archives of Maryland* 557 (1692 Maryland); *id.* at 280 (1715 Maryland); 1 Stat. 271, §1 (1792). "Notably, even when arms could be included in recovery actions, no law forbade the individual whose estate was sold from immediately acquiring new arms." Greenlee, *supra*, *Disarming the Dangerous*, 16 Drexel L. Rev. at 71 n. 427 (citing *Range*, 53 F.4th at 283).

Ultimately, Orange was not convicted of forgery of a public record, certificate, or seal. Nor was she convicted of forgery of notes, coins, or bills of a banking company or the Commonwealth. Therefore, the majority's historic analogues are illusory.

h. Original Public Meaning and Public Discourse

Even if the majority is correct that Orange can be disarmed because the Founders put to death those who forged private documents, part of our analysis under the *Bruen* test requires us to look to the original public meaning of the Second Amendment understood by the general population, turning to the public discourse among the people at the time. *Bruen*, 597 U.S. at 20, 60, 82 (reviewing historical "public discourse," "the public understanding," and "original public meaning" surrounding disarmament).

Throughout the seventeenth and eighteenth centuries, though capital statutes were in the code books, in reality, capital punishment in the colonies and at the Founding was used "sparingly," and property crimes including variations on theft, burglary, and robbery "were, on

the whole, not capital." Lawrence M. Friedman, *Crime and Punishment in American History* 42 (1993).

The legitimacy of Founding-era laws that *did* result in the death penalty for certain forgeries were seen as highly suspect. The general public stood so firmly against such harsh punishment for forgery that those laws became practically ineffective. *See* William Bradford, *Enquiry How Far the Punishment of Death Is Necessary in Pennsylvania: With Notes & Illustrations* 11 (Philadelphia: Printed by T. Dobson, 1793) (in a letter by the second Attorney General of the United States to the Pennsylvania legislature, observing that in a state punishing forgery with death, due to "the *public sentiment* revolting against this severity[,] *very few have been executed*" (emphases added)).

Along those lines, some prominent commentators regarded the imposition of the death penalty for forgery as an oppressive relic derived from an antagonistic Crown, against which we had recently declared independence. *See id.* at 9-11; *see also* James Wilson, Of Crimes Against the Right of Individuals to Their Property (1791-92), *in 3 The Works of the Honorable James Wilson, L.L.D.* 49, 51 (Bird Wilson ed., 1804) (Justice Wilson, a Constitutional Convention delegate and U.S. Supreme Court Justice, during a lecture delivered at the College of Philadelphia in the winter of 1791-92, criticizing the development of capital punishment for forgeries in England with the Latin expression, "pluet super populum laqueos"—which means, "a noose hangs over the heads of the people"—and borrowing language from England's Lord Bacon to castigate capital punishment for forgery as among those "penal laws[] which are worse than showers of hail or tempest upon cattle; for they fall upon men").[69] Because of this strong public sentiment, executions for forgeries were almost never carried out.

---

[69] Even John Locke, whose writing was singularly influential on the American revolution, advocated in his *Second Treatise* against the death penalty for all crimes that did not "recompense for death," highlighting that a murderer continues to be "dangerous" to others.

In its own attempt to capture the public understanding of forgery, the majority identifies the congressional debates of April 7, 1790 to support the contention that the death penalty was favored for forgeries. But my colleagues cite only two of the three relevant discussions on the convention floor. While Mr. Sedgwick supported capital punishment for forgery of public securities, others raised that perhaps the language—mandating a public hanging for the forgery of "securities of the United States"—"should be amended, by striking out the words 'punished with death by being hanged,' to admit less punishment for uttering or passing than for counterfeiting." 2 Annals of Cong. 1521 (Apr. 7, 1790).[70] Mr. Fitzsimon highlighted the distinction between merely uttering falsehoods and forging "public paper." *Id.* Mr. White then "observed that he was opposed in general to inflicting death, except for murder, or crimes which might terminate in murder." *Id.* He went on to say that, in the case of forgery, "there were degrees of guilt and the punishment ought to be proportioned"; he concluded that he was against capital punishment in the case of forgery of public securities. *Id.* In sum, the Founders were not in agreement regarding the capital punishment of those who forged public documents, and they did not discuss on the floor the forgery of private documents. *Id.*

---

Andrew Dilts, To Kill a Thief: Punishment, Proportionality, and Criminal Subjectivity in Locke's "Second Treatise," 40 *Political Theory* 58, 61-62 (2012) (citing Locke, § 12: "By the same reason, may a Man in the State of Nature *punish the lesser breaches* of that Law? It will perhaps be demanded, with death? I answer, Each Transgression may be *punished* to that *degree*, and with so much *Severity* as will suffice to make it an ill bargain to the Offender, give him cause to repent, and terrif[y] others from doing like"). *See also* Bradley C. Thompson, John Locke and the American Mind, 8 *American Political Thought* 575, 590 (2019) ("Serious scholars of the American Revolution have always known what pre- and postrevolutionary Americans knew with certainty: that John Locke's moral and political philosophy inspired, shaped, and guided colonial American thought in the decades leading up to the War for Independence. Ideas have consequences, and the American mind was built on Locke's modes of reasoning and principles.").

[70] The proposal was ultimately voted down, but the discourse around the language suggests that not every Founder agreed that the death penalty should be utilized for forgeries of public documents. And of course, the distinction between private and public documents makes the relevancy of the convention debate questionable in itself.

The majority notes that the states carried out an estimated 779 executions between 1608 and 1800. However, only 18 of those executions punished forgery. *See* M. Watt Espy & John Ortiz Smykla, *supra*, *Executions in the United States, 1608- 2002: The ESPY File*. And all but one of the 18 executions for forgery were performed in the state of New York. *See id.* This is the state in which, as William Bradford noted in 1796, public sentiment against this punishment was so widespread that forgery convictions in the state plummeted. *See* Bradford, *supra*, *Enquiry How Far the Punishment of Death Is Necessary*. South Carolina executed one man convicted of forgery in 1791. *See id.* But as noted above, South Carolina had no statutes in effect in 1791 that authorized the death penalty for private documents. Importantly, in *Bruen*, the Court mandated that courts

> will not give disproportionate weight to a single state statute and a pair of state-court decisions. As in *Heller*, we will not "stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense" in public.

597 U.S. at 65-66 (alteration in original) (quoting *Heller*, 554 U.S. at 632).

Lastly, it is worth mentioning that the majority's lesser-included-punishment theory ignores the fact that Orange had completed whatever sentence that was attached to her forgery of private documents. The record notes that she was not actively on probation or parole. *See Kanter*, 919 F.3d at 461-62 (Barrett, J., dissenting) ("The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.").

II. Permanent Disarmament

The majority ends its opinion with the assertion that Orange failed to show that her loss of gun rights is permanent, because Code § 18.2-308.2(c)—as well as its federal analogue, 18

U.S.C. § 925(c)—allows for firearm restoration. This claim disregards the *Bruen* Court's call for judicial review of the deprivation of constitutional rights.

To support its claim, the majority cites an amicus brief supplied—in a different case, before a different court—by the federal Attorney General's office, interpreting 18 U.S.C. § 925(c). Unfortunately, the amicus's logic cannot be applied to Virginia's state statute, as the federal statute allows for as-applied challenges to the denial of restoration to be reviewed by a district court, whose decision can then be appealed. *See* 18 U.S.C. § 925. The state statute does not have the same level of judicial review. *See* Code § 18.2-308.2(c). Virginia's restoration statute notes that "*no person who has been convicted of a felony* shall be qualified to petition for such an order *unless* his civil rights have been restored *by the Governor or other appropriate authority.*" *Id.* (emphases added); *see also Gallagher v. Commonwealth*, 284 Va. 444, 453 (2012) ("A person convicted of a felony in Virginia must first obtain an order from the Governor removing his political disabilities as a condition precedent to his right to petition the circuit court for restoration of his firearm rights."). The judiciary does not review the governor's decision. In fact, it does not appear that the Governor's decision to remove political disabilities has *any* course of appeal. *See In re Phillips*, 265 Va. 81, 87-88 (2003) ("[T]he power to remove [a] felon's political disabilities remains vested solely in the Governor, who may grant or deny any request without explanation, and there is no right of appeal from the Governor's decision.").[71]

---

[71] The Commonwealth, during oral argument, informed this court that restoration is "theoretically not permanent, [but] practically speaking, plenty of people are convicted of felonies . . . and petition unsuccessfully for the Governor to restore their rights." Oral Arg. at 18:55-19:14. The Commonwealth also admitted the denial of those petitions by the Governor is unreviewable, as the circuit court can only be petitioned once the governor has *approved* a petition. Oral Arg. at 19:25-19:45. *See also Frequently Asked Questions About Pardons*, Secretary of the Commonwealth – Candi Mundon King, https://www.commonwealth.virginia.gov/judicial-system/pardons/ (last visited May 15, 2026) ("If your pardon is denied, you may not appeal the decision. You may however file a new petition three years after the date of the denial letter."); *Restoration of Firearm Rights*, Virginia State Police, https://wwwuat.vsp.virginia.gov/services/firearms/restoration-of-firearm-rights (last

The *Bruen* Court suggested that disarmament without judicial review is constitutionally suspect because it is effectively the permanent deprivation of a person's civil right. *Bruen*, 597 U.S. at 13. And permanent disarmament is outside the nation's history and tradition. Even the colonies, after Shays's Rebellion, only disarmed insurrectionists for three years. *See* 1787 Mass. Acts 555-56.

Now that Orange has this possession of a firearm felony conviction under Code § 18.2-308.2, her ability to petition for the restoration of her civil rights could be even more difficult. The Governor will now consider Orange's *two* felony convictions. Orange will now bear the label of a "repeat offender." She will also serve a mandated prison stint, which itself burdens her present right to bear arms and will surely carry consequences that burden her future right to do so.

III. Applying the "Principles Underlying the Second Amendment" to Orange

These battles of history—one Founder's opinion pinned against a second's, scholars lobbing law review articles in the face of their peers—create ambiguity.[72] The Supreme Court

---

visited May 15, 2026) ("If you have been granted restoration of your political rights from the Governor of Virginia, you may petition circuit court of the county or city in which you reside or of the county or city in which you were convicted, for a hearing to request restoration of your firearm rights."). In fact, due process surrounding rights restoration is limited. The Governor relies solely on the submission filed with the Secretary of the Commonwealth, and any letters of support that may have been submitted. *Frequently Asked Questions About Pardons*, Secretary of the Commonwealth – Candi Mundon King, https://www.commonwealth.virginia.gov/judicial-system/pardons/ (last visited May 15, 2026). There is no additional "hearing, meeting, or conference." *Id.*

[72] Scholars and jurists are divided, fueling an active disagreement in legal and academic settings alike—each side trying to prove that American history supports their policy goals. *See Hemani*, 225 L. Ed. 2d at 337 (Jackson, J., concurring) ("[J]udges draw different conclusions from the same historical evidence and reach divergent assessments of the same laws."). My colleagues and I are so divided. This country has a long history of the very debate, argumentation, and introspection that we are in now. These disputes provide ample evidence to be hand-selected in support of contrary positions. Our country's history is so rich that almost any position could be supportable by 18th century political thinkers who struggled with the same

has not provided guidance on what lower courts must do when history is inconclusive. Perhaps common sense and practical understandings of the traditions of a nation will provide the best resolution. *See Rahimi*, 602 U.S. at 692 ("The law must comport with the principles underlying the Second Amendment.").

The principles underlying the history and tradition of firearm regulations show only dangerous individuals being disarmed. The principles of lesser-included-punishments show only those convicted of forgery of public documents being put to death—reflecting the Founders' desire to ward off insurrection or threats to the nation, one of the three categories of dangerousness that was historically regulated, as discussed at length above.

If the Supreme Court and federal circuits have emphasized dangerousness, then dangerous is the lens through which we must judge Ms. Orange. Here, it is undisputed that Orange's conviction for forgery was a nonviolent crime. *See* Code § 17.1-805(C) (delineating all violent crimes in Virginia, of which forgery is not one); 18 U.S.C.A. § 924(e) (classifying violent felonies as those crimes involving use or threat of physical force). Nothing in the record suggests that Orange used her shotgun in a dangerous manner[73]; she did not point it at anyone, she did not fire it.[74] Video provided to the police showed that she merely held the shotgun in her

---

question we do now—what is best for the people? When history competes, our answer must tap into something less illusory: practicality.

[73] Nothing in this dissent should be construed to suggest that *Bruen* and *Rahimi* prohibit the application of sentencing enhancements when a person is convicted of an armed crime; oftentimes, those enhancements *should be* applied, given the heightened danger that comes from a possessing a firearm in the commission of a crime.

[74] According to historians, under the individual rights theory held by many Founders, "the state might regulate bearing arms, but it was prohibited from regulating the right to keep arms." Saul Cornell, *Early American Gun Regulation and the Second Amendment: A Closer Look at the Evidence*, 25 L. & Hist. Rev. 197, 197 (2007). This division between using and bearing arms further supports Ms. Orange's claim, as nothing in the record indicates she fired or even pointed her shotgun at anyone inside or outside of her home. The *Bruen* Court noted that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the

hands.  During oral argument, the Commonwealth conceded that Orange is not dangerous and that forgery of private documents was not a dangerous crime.  *See* Oral Arg. at 24:25-26:30.  And yet, the majority furthers an argument that Orange is a dangerous person on the sole basis of her Class 5 felony for forgery of a private document.

IV.  Part of We the People

The only question that remains is whether Orange is covered by the plain text of the Second Amendment—that is, if she is still one of "the people."  *See* U.S. Const. amend. II (protecting the right of "the people to keep and bear arms").[75]  Yes, she is.  *See Bruen*, 597 U.S. at 31-32 (establishing three questions to resolve whether the Second Amendment covers an individual's conduct: (1) whether the defendant is part of "'the people' whom the Second Amendment protects"; (2) whether the weapon is in "common use"; and (3) whether the Second Amendment protects the defendant's "proposed course of conduct.").  The record does not show that Orange used the firearm in a dangerous or uncommon way.  She merely possessed it in her home, where the need for defense "is most acute."  *Heller*, 554 U.S. at 628.  *See also Hemani*, 225 L. Ed. 2d at 327 (prohibiting the disarmament of a man who used marijuana "about every other day" and had not "done anything with his gun other than possess it in his home").  And a

right to keep and bear arms. . . ."  *Bruen*, 597 U.S. at 32.  However, considering the special import of self-defense in the home as a principle of the Second Amendment, it is still worth noting that Orange bore her shotgun inside her own home in rural Virginia.

[75] Because it erred in its holding regarding the United States's history and tradition of disarmament, the majority has declined to rule on the question of whether Orange is part of "the people" who are covered by the Second Amendment.  However, there is a "strong presumption that the Second Amendment . . . belongs to all Americans."  *Heller*, 554 U.S. at 581.  The *Hemani* Court reiterated that "[t]he Second Amendment protects the right of 'all Americans' to keep and bear firearms for self-defense."  *Hemani*, 225 L. Ed. 2d at 322 (quoting *Heller*, 554 U.S. at 581).  "[M]any courts, following *Bruen*'s expansive language . . . have concluded that felons are embraced within 'the people' because the conduct of bearing arms for self-defense is plainly protected by the Second Amendment."  *Ginevan v. Commonwealth*, 83 Va. App. 1, 20 (2024).

shotgun is a commonly used "instrument[] that constitute[s a] bearable arm[]."[76] *Heller*, 554 U.S. at 582.

In answering whether Orange is covered by the Second Amendment, the Commonwealth argued below that those previously convicted of a Class 5 felony are not part of the people. My colleagues, though declining to decide the issue, do go so far as suggesting that "conviction of a felony is evidence of the unfitness of such persons as a class." *Supra* (citing *Foster v. Bd. of Police Comm'rs*, 102 Cal. 483, 492 (1894)). These arguments assume and ascribe dangerousness onto Orange because of her felony-status. They do not—as required by the as-applied standard—individually judge her, her history of violence, nor her behavior around others.[77] *See Hemani*, 225 L. Ed. 2d at 318-19 (detailing the government's burden, in the context of disarming drug users, to identify specific factors, such as "what controlled substance an individual uses, in what amounts he does so, or whether his drug use has ever made him a danger to himself or others").

A. The *Heller* Presumption Does Not Compel Categorical Disarmament

Firearm regulations based solely on felony-status are constitutionally suspect, as they deprive individuals of their civil right without looking to individual markers of risk. *See Hemani*, 225 L. Ed. 2d at 323 (invalidating a federal statute allowing for disarmament of drug

---

[76] *See Heller*, 554 U.S. at 622 ("[T]he Second Amendment confers an individual right to keep and bear . . . only arms that 'have some reasonable relationship to the preservation or efficiency of a well[-]regulated militia . . . .'" (quoting *United States v. Miller*, 307 U.S. 174, 178 (1939))).

[77] Not to mention that Congress has long recognized that firearm regulations cannot be "designed or enforced" in a discriminatory manner. *Bruen*, 597 U.S. at 127 (2022) (Breyer, J., dissenting); Act of July 16, 1866, §14, 14 Stat. 176-177 (ensuring that all citizens are entitled to the "full and equal benefit of all laws . . . including the constitutional right to bear arms . . . without respect to race or color, or previous condition of slavery").

users because "that statute bans a class of people . . . from possessing essentially any firearm for any purpose. As a result, the government acknowledges, it has a burden to carry").

The *Heller* Court, in dicta, asserted that broad "prohibitions on the possession of firearms by felons" were "longstanding" and declared them "presumptively lawful." 554 U.S. at 627, 635. However, the Court expressly noted that it was not "clarify[ing] the entire field" of the Second Amendment. *Id.*[78] By definition, a presumption necessitates an inquiry into whether a particular regulation could be unconstitutional as applied to specific litigants. And here, Code § 18.2-308.2 is unconstitutional as applied to Orange. There is no history or tradition of blanket disarmament on the sole basis of felony status.[79] As discussed above, felony disarmament did not become widespread until the 1970s. Felony status cannot itself be a sole marker of individual dangerousness. The Supreme Court has acknowledged: "a felon is not always more dangerous than a misdemeanant." *Lange v. California*, 594 U.S. 295, 305 (2021) (cleaned up); *see, e.g.*, Code § 18.2-57.2 (misdemeanor assault and battery against a family member).

To revoke one civil right creates a slippery slope for the revocation of other rights, solely because a person has a felony on their record. We, as a court, should be wary any time our government officials disregard a "class of persons" as irredeemable and, therefore, without

---

[78] Additionally, the decision below, affirmed by *Heller*, noted that firearm regulations on the basis of felony status "promote the government's interest in public safety consistent with our common law tradition" and "do not impair the core conduct upon which the right was premised," primarily self-defense. *Parker v. District of Columbia*, 478 F.3d 370, 399-400 (D.C. Cir. 2007). But, to support this proposition, the D.C. Circuit cited dicta from a 1980 case, *Lewis v. United States*, 445 U.S. 55, 65 n.8 (1980), which *Heller* expressly criticized. *Heller*, 554 U.S. at 625 n. 25.

[79] The first decision concerning a firearm regulation that depended "on the *condition* of a person" was not until 1886, when the Missouri Supreme Court emphasized the ability to disarm an alcoholic because he was a physical threat to others. *See State v. Shelby*, 2 S.W. 468 (Mo. 1886); Marshall, *supra*, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L.P.P. at 707.

constitutional protections. Individuals convicted of nonviolent felonies like forgery of a private document are not more or less deserving of Second Amendment protections as they are First and Fourth Amendment protections. In *Heller*, in recognizing an individual right to bear arms, the Supreme Court noted that "the Bill of Rights use[s] the phrase 'right of the people' two other times, in the First Amendment's Assembly-and-Petition Clause and in the Fourth Amendment's Search-and-Seizure Clause." 554 U.S. at 579. *Accord Bruen*, 597 U.S. at 24 (noting the Second Amendment standard "accords with how we protect other constitutional rights," including "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms").[80]

In the history of disarmament, as the majority acknowledges,[81] this country has discriminated against a great many people—on the basis of some minority status—painting them as "inherently dangerous or non-law-abiding." *Zherka v. Bondi*, 140 F.4th 68, 85 (2d Cir. 2025) ("Religious minorities, political dissenters, Native Americans, and persons of color were among the disfavored groups that historical legislatures disarmed based on a perception that persons in those categories were inherently dangerous or non-law-abiding."), *cert. denied*, 223 L. Ed. 2d 555 (2026). These categorical disarmament regulations are now disfavored. *Id.* And *Rahimi*

---

[80] Further, like the First and Fourth Amendments, the Supreme Court has held that the Second Amendment provides an *individual* right. Therefore, the Second Amendment is not to be treated similarly to the right to vote or the right to jury service, notable *civic* rights. Felon disenfranchisement laws have a long (albeit regrettable) history, and courts have interpreted the Fourteenth Amendment's protection of the right to vote as *expressly acknowledging* the authority of state legislatures to enact such disenfranchisement laws. *See* U.S. Const. amend. XIV, § 2 (providing that a state's representation in the House will be reduced if the right to vote "is denied . . . or in any way abridged, except for participation in rebellion, or other crime"). The Second Amendment contains no similar authority to abridge the right. *See Heller*, 554 U.S. at 579-80 ("[T]hese instances unambiguously refer to individual rights, *not 'collective' rights*, or rights that may be exercised only through participation in some corporate body." (emphasis added)).

[81] To the extent we are constructing a Constitutional analysis, surely it goes without saying that this Court cannot support our inquiry with laws that have been expressly overturned.

makes clear that citizens are not excluded from Second Amendment protections just because they are not "responsible."  602 U.S. at 701-02.  The Commonwealth identified little authority gracing the disarmament of Orange.  And notable authority suggests that her disarmament, hinging on the sole basis of her previous nonviolent felony, is constitutionally suspect.

B.  Completing her Sentence Made Orange Law-Abiding and Therefore Covered by the Second Amendment

Orange's conduct should be covered by the Second Amendment because she is no longer serving an active sentence or under state supervision.  Therefore, her disarmament is unjustified.  As a result of the majority's decision today, Orange will have another felony—possession of a firearm by a person convicted of a felony—and will be forced to serve a year in prison for conduct that those without felonies could have done freely.  She completed her sentence for her forgery conviction.  She became a law-abiding citizen again.[82]  *See Kanter*, 919 F.3d at 462 (Barrett, J., dissenting) ("The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.").[83]

---

[82] Orange could have had her rights restored, as she was eligible but had not yet applied.  But the restoration petition process is unimaginably complicated and, further, expensive, as a successful petition almost requires the assistance of an attorney.

[83] Completion of her sentence is an important factor here.  For instance, incarcerated individuals have neither a First Amendment right to peaceably assemble, *see Pell v. Procunier*, 417 U.S. 817, 822 (1974), nor a Fourth Amendment right as to prison-cell searches, *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).  But those released from prison clearly are free to attend protests, and their homes cannot be invaded without a search warrant.  The history and tradition of this country support applying the protections of the First and Fourth Amendment to the Second Amendment.  Founding-era laws that forfeited a person's weapon almost always limited that forfeiture to *the specific weapon used to commit a firearms-related offense* "without affecting the perpetrator's right to keep and bear arms *generally*."  *Range*, 124 F.4th at 231.  *See, e.g.*, Act of Dec. 21, 1771, ch. 540, N.J. Laws 343-344; Act of Apr. 20, 1745, ch. 3, N.C. Laws 69-70.  So, "in the Founding era, a felon could acquire arms after completing his sentence and reintegrating into society."  *Range*, 124 F.4th at 231.

The majority lambasts Orange for having a felony on her record, making a broad claim that disarming her is "justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law." *Supra* (quoting *Diaz*, 116 F.4th at 469). Not only does the majority's position fly in the face of restorative justice, but it could also jeopardize public safety. *See, e.g.*, Amber Massey, *An Eye for an Eye Will Make the Whole World Blind: How Restorative Justice Will Help Florida See Again*, 43 Nova L. Rev. 79 (2018) (detailing how restorative justice policies benefit all of society by allowing previously convicted persons to redress, atone, and reintegrate into their communities, thereby reducing recidivism rates); Charlotte Whelan, *The Importance of Prison Rehabilitation Programs Before and After Release*, Indep. Women's F. (June 29, 2020), https://www.iwf.org/2020/06/29/the-importance-of-prison-rehabilitation-programs-before-and-after-release/ (similar). Following the argument to its logical conclusion, from a practical perspective, if a person with a felony conviction is relegated to a marginalized legal status, what kind of incentives will they have to rehabilitate? Suppose Ms. Orange has made sacrifices and pushed herself to reform in the years since her forgery conviction.[84] Ignoring her efforts to repay her community, her government today continues to treat her as a "criminal" regardless of any redemptive behavior she might have displayed. As a response to the majority's opinion, surely no one could blame her for asking herself, "Why change if it will not matter?" In this way, today's decision risks detrimental effects to the state's efforts to fight recidivism with rehabilitation.

Because she completed her sentence, we should take Orange as the state would take anyone who similarly uses a firearm: as a person with the right to bear, so long as she did not harm someone else. Instead, we force her into a category of otherness, refusing to analyze her

---

[84] The record does not indicate what sentence Orange received, only that she was no longer actively serving it. She was subject to up to one year in jail or prison. *See* Code § 18.2-10.

individual markers for dangerousness, merely because her rights had not yet been restored—though she was eligible for restoration.[85]  Now she will go to prison.  With this new firearm charge, she will be considered a *violent* felon who cannot bear a shotgun in her home, vote, receive federal student aid, apply for federal housing, or obtain government benefits like the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) in the middle of her child-bearing years.

Ms. Orange has already paid her debt to society and no longer shows signs of violence.  People grow with time and the maturity it brings.  At only 25 years old, I believe Orange is bound to be one of them.  With this solid conviction, I respectfully dissent.

---

[85] The record makes no mention of whether Orange did in fact apply for her rights to be restored.  I make this point merely to highlight the very real possibility, and the endless hurdles, that many people previously convicted of a felony face every day.